## VANSTON BONDHOLDERS PROTECTIVE COMMITTEE *v.* GREEN ET AL.

NO. 42.

Argued October 22, 1946.—Decided December 9, 1946.

*George W. Jaques* argued the cause for petitioner in Nos. 42 and 43. With him on the brief were *LeWright Browning* and *Rudolf B. Schlesinger*.

*Robert J. Bulkley* argued the cause and filed a brief for petitioner in Nos. 44 and 45.

*Roger S. Foster* argued the cause for the Securities & Exchange Commission, respondent. With him on the brief were *Solicitor General McGrath, Philip Elman* and *Alexander Cohen*.

*Chas. I. Dawson* argued the cause for Early et al., respondents. With him on the brief was *A. Shelby Winstead*.

*Jay Raymond Levinson* argued the cause for the Green Committee et al., respondents. With him on the brief was *Oscar S. Rosner*.

MR. JUSTICE BLACK delivered the opinion of the Court.

December 2, 1930, a Kentucky District Court appointed an equity receiver of Inland Gas Corporation to take com-

plete and exclusive control, possession, and custody of all of Inland's properties, and enjoined Inland's officers from paying its debts. At that time there was no interest unpaid on Inland's first mortgage bonds. February 1, 1931, semiannual interest coupons fell due on these bonds. The debtor could not pay; the court did not direct the receiver to pay. The indenture trustee, acting under the terms of the indenture, promptly declared the entire principal due and payable despite the previous assumption of custody of the estate by the federal court. In 1935, the same District Court approved a creditor's petition for reorganization under § 77B of the Bankruptcy Act, and at a subsequent date the reorganization was continued as a Chapter X proceeding.[1] The indenture provides for payment of interest on unpaid interest. Inland is insolvent, but its assets are sufficient to pay the first mortgage bondholders in full, including the interest on interest. Should interest on interest be paid, however, subordinate creditors would receive a greatly reduced share in the reorganized corporation. These latter concede that the first mortgage bondholders should receive simple interest on the principal due them, but challenge their right to be paid interest on interest[2] which fell due after the court took charge of Inland, and which interest the Court, out of consideration for orderly and fair administration of the estate, directed the receiver not to pay on the due date. It is this controversy which we must determine.

The first mortgage indenture document was written and signed in New York, designated a New York bank as trus-

---

[1] Section 77B was enacted June 7, 1934, 48 Stat. 912. The § 77B petition in this case was filed while the estate continued in the equity receivership. Section 77B was superseded by Chapter X, 52 Stat. 883, 11 U. S. C. § 501 *et seq.* Section 276 of Chapter X, 11 U. S. C. 676, authorized continuance of the § 77B proceedings under Chapter X. See *Young* v. *Higbee Co.,* 324 U. S. 204, 205, n. 1.

[2] The claims for interest on interest amount to some $500,000.

tee, and provided for payment of the bonds and attached interest coupons at the office of the trustee in New York or, at the option of the bearer, at a bank in Chicago, Illinois.  A group of investment bankers underwrote the issue, sold the bonds to the public, and received a percentage of the proceeds and additional compensation for their services.  Inland was organized under the corporation laws of Delaware.  Its principal place of business was in Kentucky, and the property mortgaged was located in that state.

Under these circumstances the District Court was of the opinion that it must allow the claim for interest on interest if the indenture covenant was valid; that its validity must be determined by the law of New York, because the indenture was signed and the bonds were payable there; and that the covenant was valid there.  Accordingly, the first mortgage bondholders were held entitled to interest on interest.  Holding that New York prohibited covenants for payment of interest on interest, the Circuit Court of Appeals reversed.  151 F. 2d 470.  We granted certiorari because of the importance of the questions raised.

The Circuit Court of Appeals thought the bankruptcy court must allow or disallow the claim for interest on interest according to whether the covenant to pay it was valid or invalid as between the parties to that covenant.  It considered the covenant invalid and therefore unenforceable in bankruptcy upon two alternative assumptions. First, it assumed that a controlling federal rule required the bankruptcy court to determine validity or invalidity of the contract by looking to the law of New York, the state where the court found that the contract was "made" and primarily payable.[3]  Second, since the bankruptcy

---

[3] The Circuit Court of Appeals thought a reference to New York law was authorized by the following cases: *Cromwell* v. *County of*

court was sitting in Kentucky, it should determine validity of the covenant as would a Kentucky court. Reviewing Kentucky decisions, the Circuit Court of Appeals concluded that Kentucky courts also would apply New York substantive law. Arriving at New York law by both hypotheses, the Circuit Court of Appeals interpreted that law as rendering the covenant invalid. We agree with the conclusion of the Circuit Court of Appeals that the claim for interest on interest should not be permitted to share in the debtor's assets, but disagree with the reasons given for that conclusion.

A purpose of bankruptcy is so to administer an estate as to bring about a ratable distribution of assets among the bankrupt's creditors. What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.[4]  *Bryant* v. *Swofford Bros.,* 214 U. S. 279, 290–291; *Security Mortgage Co.* v. *Powers,* 278 U. S. 149, 153–154. But obligations, such as the one here for interest, often have significant contacts in many states, so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can

---

*Sac,* 96 U. S. 51; *Scudder* v. *National Bank,* 91 U. S. 406, 412; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, 453. None of these cases nor any cited by petitioner here, e. g., *Seeman* v. *Philadelphia Warehouse Co.,* 274 U. S. 403, involve questions of distribution of a debtor's assets in receivership, bankruptcy or reorganization to meet claims for interest on interest said to have accrued after a court took possession of a debtor's estate.

[4] Of course, there might be instances where the validity of the obligation would be determined by reference to the law of some foreign country.

seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states. Certainly the part of this transaction which touched New York, namely, that the indenture contract was written, signed, and payable there, may be a reason why that state's law should govern. But apparently the bonds were sold to people all over the nation. And Kentucky's interest in having its own laws govern the obligation cannot be minimized. For the property mortgaged was there; the company's business was chiefly there; its products were widely distributed there; and the prices paid by Kentuckians for those products would depend, at least to some extent, on the stability of the company as affected by the carrying charges on its debts. But we need not decide which, if either, of these two states' laws govern the creation and subsistence and validity of the obligation for interest on interest here involved. For assuming, *arguendo,* that the obligation for interest on interest is valid under the law of New York, Kentucky, and the other states having some interest in the indenture transaction, we would still have to decide whether allowance of the claim would be compatible with the policy of the Bankruptcy Act. Cf. *Kuehner* v. *Irving Trust Co.,* 299 U. S. 445, 451.

In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. *Erie R. R.* v. *Tompkins,* 304 U. S. 64, has no such implication. That case decided that a federal district court acquiring jurisdiction because of diversity of citizenshp should adjudicate controversies as if it were only another state court. See *Holmberg* v. *Armbrecht,* 327 U. S. 392. But bank-

ruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.[5] And we think an allowance of interest on interest under the circumstances shown by this case would not be in accord with the equitable principles governing bankruptcy distributions.

When and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law. *Cf. Board of Comm'rs of Jackson County* v. *United States,* 308 U. S. 343; *Royal Indemnity Co.* v. *United States,* 313 U. S. 289. The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings. Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment—a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved. Thus this Court has said: "We cannot agree that a penalty in the name of interest should be inflicted upon the owners of the mortgage lien for resisting claims which we have disallowed. As a general rule, after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds. The delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate." *Thomas* v. *Western Car Co.,* 149 U. S. 95,

---

[5] *Heiser* v. *Woodruff,* 327 U. S. 726, 732; *American Security Co.* v. *Sampsell,* 327 U. S. 269, 272; *Pepper* v. *Litton,* 308 U. S. 295, 303–306.

**164**

116–117. *Cf. American Iron Co.* v. *Seaboard Air Line,* 233 U. S. 261. Courts have felt that it would be inequitable for anyone to gain an advantage or suffer a loss because of such delay. *Sexton* v. *Dreyfus,* 219 U. S. 339, 346. Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputation of interest causing recomputation of claims could be avoided. Moreover, different creditors whose claims bore diverse interest rates or were paid by the bankruptcy court on different dates would suffer neither gain nor loss caused solely by delay.[6]

Simple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due. *Sexton* v. *Dreyfus, supra.* To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors. Thus we recently said: "Since the distribution provided for these bonds on the basis of their mortgage securities is less than the principal amount of their claim, the limitation of their right to share the unmortgaged assets ratably with the unsecured creditors on the basis of principal and interest prior to bankruptcy only is justified under the rule of *Ticonic National Bank* v. *Sprague,* 303 U. S. 406." *Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 318 U. S. 523, 573. But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor.

---

[6] See § 63a (1) of the Bankruptcy Act, 11 U. S. C. 103a (1); *cf.* § 63 of the Act of 1898, 30 Stat. 562 and § 19 of the Bankruptcy Act of 1867, 14 Stat. 525. For a discussion of interest claims in bankruptcy see 3 Collier on Bankruptcy (14th Ed.) 281, 1835.

*Coder* v. *Arts*, 213 U. S. 223, 245; *Sexton* v. *Dreyfus, supra.* See also *Johnson* v. *Norris,* 190 F. 459.[7]

It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor. See *Sexton* v. *Dreyfus, supra,* at 346. That the proceedings before us have moved from equity receivership through § 77B to Chapter X in the wake of statutory change does not make these equitable considerations here inapplicable. A Chapter X or § 77B reorganization court is just as much a court of equity as were its statutory and chancery antecedents. See *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510, 527.[8]

In this case, where by order of the court interest was left unpaid, we do not think that imposition of interest on that unpaid interest can be justified by "an application of equitable principles." See *Dayton* v. *Stanard,* 241 U. S. 588, 590.[9] Prior to the beginning of the equity receiver-

---

[7] Analogous principles have been applied to the liquidation of national banks. *White* v. *Knox,* 111 U. S. 784, 786–87, relied on in *Sexton* v. *Dreyfus, supra,* 346; *Ticonic Nat'l Bank* v. *Sprague,* 303 U. S. 406, 412–13.

[8] Section 115 of Chapter X; 11 U. S. C. 515 authorizes a Chapter X court to exercise "all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor . . ." Former § 77B of the Bankruptcy Act, 48 Stat. 912, and § 77 (a), 11 U. S. C. § 205 (a) (Railroad Reorganization) contain similar provisions.

[9] Petitioner and the Circuit Court have cited non-bankruptcy cases which award interest on interest to support the award in this reorganization. *Town of Genoa* v. *Woodruff,* 92 U. S. 502; *Edwards* v. *Bates County,* 163 U. S. 269. Diversity of citizenship brought these cases to the federal courts. None of them presented to the courts the special bankruptcy problems of uniformity, ratable distribution and fairness and equity which grow out of the context of the bankruptcy law.

ship, Inland would have never owed interest on interest unless and until it had breached its obligation to pay simple interest promptly—on the date it was due. Before the receivership began, a failure by Inland to pay coupons on the date they were due might have breached an existing obligation. This breach would have imposed upon Inland, under the terms of the covenant, a duty to pay interest on the interest it had failed to pay.[10]   But when the equity receivership intervened, these interrelated obligations were drastically changed. The obligation to make prompt payment of simple interest coupons was suspended. In fact, both Inland and the receiver were ordered by the court not to pay the coupons on the dates they were, on their face, supposed to have been paid. The contingency which might have created a present obligation to pay interest on interest—i. e., a free decision by the debtor that it would not or could not pay simple interest promptly— was prohibited from occurring by order of the court. That order issued for a good cause, we may assume: to preserve and protect the debtor's estate pending a ratable distribution among all the creditors according to their interests as of the date the receivership began. The extra interest covenant may be deemed added compensation for the creditor or, what is more likely, something like a penalty to induce prompt payment of simple interest.   In either event, first mortgage bondholders would have been enriched and subordinate creditors would have suffered a corresponding loss, because of a failure to pay when payment had been prohibited by a court order entered for the joint benefit of debtor, creditors, and the public.   Such a result is not consistent with equitable principles.   For legal suspen-

---

[10] Had a breach occurred and a suit been filed in state court prior to receivership or bankruptcy, that court would have been required to determine whether the covenant was valid under the controlling state law.

sion of an obligation to pay is an adequate reason why no added compensation or penalty should be enforced for failure to pay.

*Affirmed.*

MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE JACKSON joins, concurring; MR. JUSTICE BURTON having concurred in the opinion of the Court also joins in this opinion.

In 1928 the Inland Gas Corporation, chartered by Delaware, floated a first mortgage bond issue covering property located in Kentucky where it had its principal place of business. The mortgage indenture was executed in New York, designated a New York corporation as trustee, and made the bonds and coupons payable in New York, or, at the option of the holder, in Chicago where the debtor had a paying agent. By an explicit clause in the indenture, the debtor agreed to pay interest on defaulted coupons at the rate which applied to the bonds themselves before maturity. The bonds were sold to the public in many States.

The debtor defaulted on coupons and also on the bonds when they became due. Reorganization proceedings under § 77 of the Bankruptcy Act were begun by creditors in the District Court for the Eastern District of Kentucky. Subsequently Chapter X of that Act was made applicable. In these proceedings a claim, based on the covenant in the indenture, was made by mortgage bondholders for interest on the defaulted interest coupons. The bankruptcy court allowed the claim, apparently because it concluded that the covenant is valid by the law of New York. The Circuit Court of Appeals for the Sixth Circuit

reversed. 151 F. 2d 470. That court, apparently deeming itself ultimately controlled by the local law of Kentucky which, in turn, looked to the law of New York, ruled that the claims should have been disallowed because the contract for the payment of interest on coupons was void under New York law. On the other hand, the Securities and Exchange Commission, a statutory party to the proceedings (§ 208 of the Bankruptcy Act, 11 U. S. C. 608), urges allowance of the claim if the covenant would, apart from bankruptcy, be upheld in the courts of any State having "a substantial relationship to the transaction." The Commission therefore supports allowance of the claim because it finds that two of the States related to the transaction would uphold the covenant: Delaware, the State of the debtor's incorporation, and Kentucky, its principal place of business and the site of the mortgage property. Finally another view suggests that whether interest should be allowed in this case is a matter of federal law to be fashioned by the bankruptcy court in the light of general, undefined notions of equity policy and of bankruptcy administration.

Of course, where rights are created by the Constitution, treaties or statutes of the United States and do not owe their origin to the laws of any State, the granting or withholding of interest as part of the remedy is also a function of federal law. That is the upshot of the decision in *Board of Commissioners* v. *United States,* 308 U. S. 343. The factors legally decisive of the present problem are the opposite of those which controlled our decision in that case. There we had a right created by federal law. In this case, it was beyond the power of federal law to create the right for which claim was made, although, if by State law such a right came into being, it might become a question whether the federal courts should recognize such a right when they are sought to be utilized as instruments for its enforcement.

Conflict-of-law problems have a beguiling tendency to be made even more complicated than they are. Therefore, they are often, as now, fitting occasions for observing the classic admonition to begin at the beginning. The business of bankruptcy administration is to determine how existing debts should be satisfied out of the bankrupt's estate so as to deal fairly with the various creditors. The existence of a debt between the parties to an alleged creditor-debtor relation is independent of bankruptcy and precedes it. Parties are in a bankruptcy court with their rights and duties already established, except insofar as they subsequently arise during the course of bankruptcy administration or as part of its conduct. Obligations to be satisfied out of the bankrupt's estate thus arise, if at all, out of tort or contract or other relationship created under applicable law. And the law that fixes legal consequences to transactions is the law of the several States. Except for the very limited obligations created by Congress, *e. g.,* *Holmberg* v. *Armbrecht,* 327 U. S. 392, a debt is not brought into being by federal law. Obligations exist or do not exist by force of State law though federal bankruptcy legislation is in force, just as State law determined whether they came into being or did not come into being between 1878 and 1898 when there was no bankruptcy law. The fact that subsequent to the creation of a debt a party comes into a bankruptcy court has no relevance to the rules concerning the creation of the obligation. Of course a State may affix to a transaction an obligation which the courts of other States or the federal courts need not enforce because of overriding considerations of policy. And so, in the proper adjustment of the rights of creditors and the desire to rehabilitate the debtor, Congress under its bankruptcy power may authorize its courts to refuse to allow existing debts to be proven. It may do so, for instance, where the recognition of such claims would undermine the fair administration of a debtor's

estate, even though before bankruptcy such a claim would have supported a valid judgment in the courts of the State which created the obligation, or even in the courts of the State where the bankruptcy court is sitting. But the threshold question for the allowance of a claim is whether a claim exists. And clarity of analysis justifies repetition that except where federal law, wholly apart from bankruptcy, has created obligations by the exercise of power granted to the federal government, a claim implies the existence of an obligation created by State law. If there was no valid claim before bankruptcy, there is no claim for a bankruptcy court either to recognize or to reject.

Such an analysis, however phrased, is indispensable to the solution of the problem now before us. Putting the wrong questions is not likely to beget right answers even in law. One way of putting our problem is to ask whether the bankruptcy court executing the policy of Congress could recognize a claim for interest on coupons and allow it to share in the distribution of the bankrupt's assets. But thus to frame the question is to avoid the crucial preliminary inquiry whether any obligation exists to be recognized. For nothing comes into a bankruptcy court to which congressional policy can apply unless it is an obligation created by applicable State law. And no obligation finds its way into a bankruptcy court unless, by the law of the State where the acts constituting a transaction occur, the legal consequence of such a transaction is an obligation to pay. See *Bryant* v. *Swofford Bros.,* 214 U. S. 279, 290–91; *Benedict* v. *Ratner,* 268 U. S. 353; *Security Mortgage Co.* v. *Powers,* 278 U. S. 149. Where a transaction in its entirety occurs in one State, it is clearly the law of that State that determines if an obligation is born, whether the question becomes relevant in a bankruptcy court or in any other court. But the mere fact that an agreement is made in one State by citizens of a second State for performance in a third and affecting individuals

in all forty-eight States does not change the principle inherent in our federal scheme, that the existence of a debt comes about not by federal law but by force of some State law, even though the right to enforce the debt, if it exists, may raise federal questions if bankruptcy ensues. Bankruptcy legislation is superimposed upon rights and obligations created by the laws of the States. Compare *Marshall v. New York,* 254 U. S. 380. We do not reach considerations of policy in bankruptcy administration until there are rights, created by applicable local law, to be recognized.

This brings us to the immediate situation. This is not a case where damages are claimed, in the form of interest, for the detention of monies due. In such a situation the right to interest and its measure become matters for judicial determination. The claim here asserted is based solely on the terms of the agreement. The covenant for interest on interest was entered into by the parties in New York. The dominant place of performance was also New York. In the circumstances, if the words of the indenture created an obligation, they did so only if the law of New York says they did. Williston, Contracts § 1792. If New York outlawed such a covenant, neither Kentucky nor Delaware nor the States in which bonds were sold or where bondholders reside could give effect to an obligation which never came into being. Compare *John Hancock Ins. Co.* v. *Yates,* 299 U. S. 178. And the ultimate voice of New York law, the New York Court of Appeals, speaking through Judge Cardozo, stated it as settled law that "a promise to pay interest upon interest is void . . ." *Newburger-Morris Co.* v. *Talcott,* 219 N. Y. 505, 510, 114 N. E. 846. This view of the New York law is supported by the great weight of Judge Mack's authority. *American Brake Shoe & Foundry Co.* v. *Interborough Rapid Transit Co.,* 11 F. Supp. 418, 419–420. But see *American Brake Shoe & Foundry Co.* v. *Interborough*

*Rapid Transit Co.,* 26 F. Supp. 954, *contra.* However, it is not for us to ascertain independently whether the law of New York deemed a nullity the agreement that was here sought to be made the basis of a claim. We would not have brought the case here on that issue. The Circuit Court of Appeals made such an investigation and concluded that in New York the undertaking to pay interest was void. We accept this finding and conclude that since no obligation was created there was no claim provable in bankruptcy. And so we are not now called upon to decide whether as a matter of bankruptcy administration an agreement to pay interest on interest, where it is an obligation enforceable by State law, is enforceable in bankruptcy. That is a question that can arise only where such an obligation arose under State law. The opposite is the assumption in the case before us.

It is argued, however, that this conclusion subjects the fate of a claim in bankruptcy to the whim of State law. We are told that this result is against the policy of Congress implied in measures for the protection of investors and contravenes the requirement of "uniform Laws on the subject of Bankruptcies." Art. I, § 8, Cl. 4. But this misconceives the purpose and settled understanding of the bankruptcy clause of the Constitution. The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits. See *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 190. To establish uniform laws of bankruptcy does not mean wiping out the differences among the forty-eight States in their laws governing commercial transactions. The Constitution did not intend that transactions that have different legal consequences because they took place in different States shall come out with the same result be-

cause they passed through a bankruptcy court. In the absence of bankruptcy such differences are the familiar results of a federal system having forty-eight diverse codes of local law. These differences inherent in our federal scheme the day before a bankruptcy are not wiped out or transmuted the day after.