In re **GOVERNMENT SECURITIES CORPORATION, Debtor.**

**Bankruptcy Nos. 87–0910–CIV–KEHOE, 87–0245–BKC–AJC–A.**

United States Bankruptcy Court, S.D. Florida.

June 30, 1988.

John R. Camp, Jr., trustee.

Patrick S. Scott, Miami, Fla., for trustee.

Theodore H. Focht, Gen. Counsel, Michael E. Don, Deputy Gen. Counsel, Josephine Wang, Associate Gen. Counsel, for Securities Investor Protection Corp.

## MEMORANDUM DECISION ON OPPOSITIONS TO TRUSTEE'S DETERMINATIONS

A. JAY CRISTOL, Bankruptcy Judge.

These matters were considered at hearings on June 22 and 23, 1988 upon customer-claimants' oppositions to the trustee's determinations of their customer claims. A listing of the customer-claimants is included in the two notices of hearing.

This proceeding was commenced in the District Court on May 12, 1987 under the Securities Investor Protection Act ("SIPA" or "the Act," 15 U.S.C. § 78aaa et seq.) and pursuant to the Act, was removed to this court where for all practical purposes it is a bankruptcy proceeding. The Act created the Securities Investor Protection Corporation ("SIPC") which is a non-profit membership corporation. Under the Act SIPC must establish a fund via assessments upon its members, which include most interstate broker-dealers in securities.

As amended in 1978 the Act provides that a fund of "customer property," as defined in 15 U.S.C. § 78*lll* (4), shall be set aside for distribution exclusively to customers. The Act also authorizes SIPC to advance to a SIPA trustee, in order to satisfy net equity claims of customers, not more than $500,000 per customer, of which no more than $100,000 may be used to satisfy the cash portion of an individual claim. To the extent of its advances, SIPC is subrogated to the claims of such customers whose claims are satisfied by the trustee.

SIPC protects customers only within the statutory limits, and then only to the extent that the fund of "customer property" which the debtor has among its assets is insufficient to satisfy customer claims. It has been held, and the history of the Act bears out the conclusion, that customers are entitled to their preferred status in making claims against the fund of customer property only to the extent that the losses are caused by the financial difficulties of the debtor. As was held by Bankruptcy Judge Galgay in *SEC v. Howard Lawrence & Co., Inc.*, 1 B.C.D. 577, 579 (S.D.N.Y.1975):

> The SIPA does not protect customer claims based on fraud or breach of contract. The Act is designed to remedy situations where the loss arises directly from the insolvency of the broker-dealer. Customers are protected from funds or securities lost as a result of the liquidation of the broker. It does not apply to the case where the loss arises from a breach of contract. The failure to comply with a sell order does not result from the insolvency, but rather gives rise to a cause of action for breach of contract. *SEC v. J.J. Salmon & Co., Inc.*, 1974 Fed.Sec.L.[Rep.] 94 852 (S.D.N.Y.) in Bankruptcy Court 72 Civ 560 (10/15/74). This breach of contract action if success-

ful would place claimants in the position of general creditors.

Bankruptcy Judge Prudence B. Abram of the Southern District of New York, in holding that even an arbitrator's award directing restitution of cash to a customer's account as a result of fraud does not create a customer claim, explained in *In re M.V. Securities, Inc.*, 48 B.R. 156, 160 (S.D.N.Y., Bkcy.1985):

> [I]t seems plain that SIPA's primary intent and policy are to protect customers who have cash and securities being held for them by a broker-dealer, rather than to serve as a vehicle for the litigation of claims of fraud or violations of Rule 10b–5 * * * *SEC v. North American Planning Corporation*, 72 Civ. 3158 (Bkrtcy., S.D.N.Y.1974) (Unpublished Opinion at 4). To require the Trustee to use SIPC funds to pay damages for a breach of contract claim against the debtor would not serve the congressional purpose of avoiding the domino effect inherent in unfulfilled open contractual commitments and would only serve to give a windfall to those who are general creditors based upon breach of contract claims. *SEC v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 949, 952–3 (D.C.S.D.N.Y.1974).

In accord is the decision of Judge Britton in *In re First State Securities Corp.*, 34 B.R. 492, 496 (Bkcy.S.D.Fla., 1983) wherein it was held:

> Claims 803, 805 and 806 include claims for failure by the debtor to execute an order to sell securities for the account of the claimant. The trustee (again on behalf of SIPC) has denied that these claims were *within the SIPA coverage. I agree.*
> [Citing *SEC & SIPC v. Harold Lawrence & Co.*, 4 CBC 1, 6 (Bkrtcy.S.D.N.Y. 1975)].

In this court's order setting the procedures for determination of customer claims, entered May 16, 1987, the court required any customer disagreeing with the trustee's determination of his or her claim to file an Opposition with the court and serve a copy upon the trustee. The trustee made his determinations of over 3,300 customer claims. Approximately 100 customers filed oppositions to those determinations, but most of those oppositions were subsequently withdrawn. The 38 oppositions which remained were set for hearing on June 22 and 23, 1988. Prior to the hearing dates another 9 oppositions were withdrawn, so that hearings were held on the remaining 29. Of that number 17 failed to appear or to request hearing by telephone, and 2 of the 6 who requested telephonic hearings were not there to be heard when the court telephoned them at the appointed time. Those nineteen customers have therefore waived their right to be heard, leaving 10 oppositions to be considered.

Those customers who are found to have waived the right to be heard on their oppositions, and whose oppositions are therefore denied, include customers Baksi (Customer Claim No. ("CC") 2292); Bass (CC 1508); Cora (CC 2834); Cotten (CC 1497); Grossman (CC 2062); Gunther (CC 1070); Loperena (CC 2186); B. Perez (CC 779); R. Perez (CC 176); Popejoy (CC 770); M. Rodriguez (CC 70); Ghelarducci (CC 2149); Hester (CC 202); Martinez (CC 808); T. Rodriguez (CC 1780); Suarez (CC 504); Swadlow (CC 1177); Vacca (CC 1849) and Rotman (CC 2912).

Of those customers whose oppositions were considered by the court, customers Ball (CC 1714); Benson (CCs 4 and 5); Downs (CC 1529); Levi (CC 3009); Luscher (CC 432); Phillips (CC 2750) and Ducosquier (CC 2051) all based their oppositions on one or more of

(a) the trustee's failure to refund the "premium" they paid for their GNMAs or

(b) fraud practiced upon them by the registered representative who sold them their GNMAs, either by reason of nondisclosure of the existence of any premium at all being charged, or by misrepresentation or by bold-faced lies as to why their purchase price was more than the unpaid principal balance on their securities as of the trade date, or

(c) by reason of fraud based on the alleged gouging or excessive mark-up which Government Securities Corporation added to the premium which was charged, or

(d) they did not get the yield which they had anticipated on their investment.

If all seven customers had alleged all of the foregoing as the basis of their oppositions, it would not change the result for any of them. Each may or may not have a fraud claim should it ever become worthwhile for them to prove up such a claim as a general creditor, but none has an unsatisfied customer claim which can be enforced against the fund of customer property or against that fund as supplemented by SIPC.

It is a fact of life in the investment world, a fact which requires no documentation or authority, that fixed-rate securities such as GNMAs regularly trade at either a discount or a premium depending on a variety of factors, including interest rates and what the market price is for such securities. Any person who makes a decision to enter into transactions in the investment world or the financial world must take it upon himself to ascertain at least some basic facts about that world. It would be a better world to live in if people could rely on brokers and registered representatives to give an investment course before accepting a person as a customer, but that seems to be too much to hope for. Government Securities Corporation ("GSC") and its registered reps certainly did not make it a better world.

Nevertheless, it is an equally undisputed fact that a broker-dealer such as GSC—or any other business which might be mentioned—must make a profit if it is to stay in business. A mark-up is the usual way for a retailer to make a profit, be it a broker, a grocer or a clothier. They buy at wholesale and sell at retail. GSC was in the business of retailing GNMA securities. GSC's mark-up, that is, the price it charged over what it had to pay to buy GNMAs in the market, may or may not have been unconscionable. Other brokers might have sold the same product at a lesser price, but

that is the benefit of doing comparison shopping, whatever a consumer is buying.

■ In summary, a customer does not have a claim against GSC's fund of customer property for the premium he or she paid, whether it was paid unknowingly, or by reason of non-disclosure or by reason of actual fraud, because the loss, if any, sustained by such customer was not a result of the insolvency of GSC, nor was it caused by the liquidation of GSC.

The remaining two oppositions are those of Mr. Berson (CC 2457) and Mr. Bacher (CC 309).

Mr. Berson bought a GNMA in 1985 and has written the trustee five letters asking for delivery of his certificate. As is set forth in the trustee's letter to Mr. Berson's attorney, dated December 22, 1987, GSC's records contain a receipt for a certified letter sent to Mr. Berson and signed for by him on November 8, *1985,* which letter transmitted his original certificate to him.

The trustee's staff, after much research, determined that his certificate was transferred into the name of Dean Witter Reynolds on March 31, 1986, and that a Form PD 1832 (Special Form for Detached Assignment for United States Registered Securities) had been signed by Mr. Berson on February 25, 1986, and that his signature had been guaranteed by The Mall Bank in West Palm Beach. All of the above information, including copies of Dean Witter's trade ticket and of the Form 1832 were furnished to Mr. Berson's attorney with the trustee's December 22, 1987 letter.

According to the debtor's records, Mr. Berson has no claim against the GSC estate. His opposition is therefore denied.

■ Mr. Bacher was one of the fortunate customers who invested so late in the game that GSC had not had time to allocate a GNMA pool for his investment. The trustee therefore refunded his $50,000 investment in full in cash, however Mr. Bacher claims that he is entitled to interest for the 84 days between the date he made his investment (4/24/87) and the date he actually received the trustee's check (7/15/87). Claims for loss of use of funds are not

allowable under SIPA, no matter how long the delay in the trustee's payment of monies on a customer's claim. *SIPC v. Ambassador Church Finance/Development Group, Inc.*, 788 F.2d 1208 (6th Cir.1986), cert. denied 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1987).

> [SIPC] argues that since liquidation under the SIPA parallels a bankruptcy proceeding, the District Court could award interest against Ambassador's estate only if the estate's assets were sufficient to satisfy the principal amount of all valid claims against the estate. Essentially, a liquidation under the SIPA is a bankruptcy proceeding ...

> \*    \*    \*    \*    \*    \*

Under bankruptcy law, with certain exceptions not applicable in this case, a court cannot award post-petition interest against the debtor's estate unless a surplus exists. [footnote omitted] In *Nicholas v. United States*, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966), the Supreme Court stated: "It is a well-settled principle of American bankruptcy law that in cases of ordinary bankruptcy, the accumulation of interest on claims against a bankrupt estate is suspended as of the date the petition in bankruptcy is filed." *Id.* at 682, 86 S.Ct. at 1678 (citation omitted). In *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162, (1946), the Supreme Court explained the reason for the rule:

> Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment—a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved.

Furthermore, the rule reflects "the broad equitable principle that creditors should not be disadvantaged vis-a-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws." *Nicholas v. United States*, supra at 683, 86 S.Ct. at 1679 (footnote omitted). The SIPC reasons that since the debtor's estate is insolvent, the District Court could not award interest on plaintiffs-appellees' claims. We agree.

\*    \*    \*    \*    \*    \*

Furthermore, 15 U.S.C. § 78fff–3 provides the exclusive authority for the SIPC to advance funds to a trustee in a liquidation proceeding. [-footnote omitted] Although 15 U.S.C. § 78fff–3(b) gives the SIPC authority to advance administrative expenses to the trustee and § 78fff–3(c) allows the SIPC to make certain discretionary advances, § 78fff–3(a) governs the SIPC's advances to the trustee to satisfy the "net equity claims of customers of the debtor." Title 15 U.S.C. § 78*lll*(11) defines "net equity".

\*    \*    \*    \*    \*    \*

Since the definition of "net equity" does not include interest, we hold that the SIPA does not authorize the SIPC to pay interest, either to the trustee or directly to the debtor's customers. As the District Court noted in its opinion, "Congress could have specifically provided for payment of interest out of the funds of SIPC, but did not do so."

Accordingly, Mr. Bacher's opposition is denied.

Finally, it should be noted that the Ball opposition supra, was filed as a "premium claim" but was presented as both a premium claim and a claim for the loss of use of funds. That portion of the Balls' argument relative to their second ground for disagreement with the trustee's determination of their claim is likewise answered by *SIPC v. Ambassador*, supra.

Separate orders will be entered accordingly.