**In re OAK PARK CALABASAS CONDOMINIUM ASSOCI-ATION, Debtor.**

**No. SV 02–17038–GM.**

United States Bankruptcy Court, C.D. California.

Oct. 23, 2003.

Rodger M. Landau, Los Angeles, CA, for Debtor.

**MEMORANDUM OF OPINION ON CONFIRMATION OF DEBTOR'S PLAN [11 U.S.C. § 1129(a)(7)]**

GERALDINE MUND, Bankruptcy Judge.

I.  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 666

II.  *"BEST INTEREST OF CREDITORS" RULE—11 U.S.C. § 1129(a)(7)* . . . . . . . . . . 667
   A.  *The Value on the Effective Date of What ECC Will Receive or Retain Under the Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 667

B. *The Value that ECC Would Receive or Retain if the Debtor Were Liquidated Under Chapter 7 on the Effective Date* ..................... 668
   1. *Recoveries from the Estate* ........................................ 668
   2. *The Value of What ECC Would Retain After Liquidation* .............. 669
      a. *Power of the HOA Board to Assess* ........................... 669
      b. *Using Court Process to Collect* ................................ 670
      c. *The Maximum Amount to Which ECC is Entitled* ............... 672
      d. *Amount Available* ........................................... 674

III. *OTHER ISSUES* ................................................ 675

The Debtor, a condominium homeowner association, seeks to confirm a Plan over the rejection of its principal creditor, who holds a California Superior Court judgment now on appeal. The Plan proposes to pay the final judgment in full at the federal judgment interest rate of 1.82% over of period of 20 years, rather than at the California judgment interest rate of 10%. Because of the uncertainties in this case and the interest rate provided for in the Plan, I cannot find by a preponderance of the evidence that there is a reasonable possibility that the creditor will receive at least as much under the Plan as it would on the effective date if this case were in Chapter 7. Therefore, the Plan does not meet the requirements of 11 U.S.C. § 1129(a)(7) and cannot be confirmed.

## I. INTRODUCTION

Oak Park Calabasas Condominium Association (the "Debtor" or "HOA") is a California public benefit corporation formed in compliance with California Civil Code Section 1363(a)[1], which requires a common interest development to be managed by an association. As a homeowner association, the HOA is regulated by the Davis–Stirling Common Interest Development Act ("Davis–Stirling Act"), which is set forth in California Civil Code Sections 1350–1376. The Davis–Stirling Act, which was amended thirty-nine times between 1987 and 1998[3] with still more amendments since then, differs substantially from the Uniform Condominium Act, thereby limiting my use of cases from other jurisdictions.

After the Oak Park Calabasas Condominium complex was damaged in the 1994 Northridge earthquake, the Debtor contracted with ECC Construction, Inc. ("ECC") to conduct earthquake repairs. Disputes arose between the HOA and ECC, which resulted in ECC filing suit against the HOA and its members in California Superior Court. On August 5, 2002, after a six-month jury trial, a judgment was entered against the HOA and in favor of ECC for $7,154,544.70 (as amended), including damages for breach of contract, fraud, failure to pay retention, punitive damages, attorneys' fees, and costs. This judgment is on appeal to the California Court of Appeal. Prior to this bankruptcy, the Superior Court determined that the individual homeowners were not liable for ECC's claims and that ECC had not prop-

---

1. This opinion refers to the California Civil Code concerning the formation, rights and responsibilities of the Homeowner Association; the California Code of Civil Procedure as to collection of judgments; and to the Bankruptcy Code (set forth in 11 U.S.C. § 101, et seq.). For each citation, all references will be to 11 U.S.C. § 101, et seq., unless otherwise specified.

3. Katharine N. Rosenberry & Curtis G. Sproul, *A Comparison of California Common Interest Development Law and the Uniform Common Interest Ownership Act,* 38 Santa Clara L.Rev. 1009, 1010 (1998).

erly perfected its mechanic's liens against the homeowners' units.

The Debtor's disclosure statement, which I approved over the objection of ECC, puts the members of the HOA in Class 7 and divides the creditor classes as follows: Class 1, the secured claim of TC Investments for an SBA loan; Class 2, the secured mechanic's lien of A/C Care, Inc.; Class 3 (of which there are no members), unsecured priority claims; Class 4, the disputed unsecured claim of ECC; Class 5, a convenience class of creditors holding claims of under $1,000; and Class 6, all other unsecured claims. All classes, except Class 5, are impaired. All classes except Class 3 (containing no members) and Class 4(ECC) have voted to accept their treatment under the Plan. In prior hearings I have ruled on all issues, including ECC's assertion of improper classification, except whether the Plan: (1) meets the "best interest of creditors test" as set forth in § 1129(a)(7)(A); (2) is "fair and equitable" under § 1129(b)(2)(B); (3) is "proposed in good faith" as required by § 1129(a)(3); and (4) is feasible as described in § 1129(a)(11).

## II. *"BEST INTEREST OF CREDITORS" RULE—11 U.S.C. § 1129(a)(7)*

Section 1129(a)(7)(A) requires that a holder of a claim who has not accepted the plan must

(1) receive or retain property under the plan, which has a value on the effective date

(2) which is at least as much as the holder would receive or retain if the debtor were liquidated under chapter 7 on the plan's effective date.

Because 11 U.S.C. § 102(5) states that " 'or' is not exclusive," I need to determine not only the amount that ECC would receive through the Plan or from a chapter 7 trustee, but the present value as of the effective date of any remaining right to execute on its judgment. As set forth below, the Debtor is not able to show by preponderance of the evidence that there is at least a reasonable possibility that the Plan will comply with the requirements of § 1129(a)(7).[4]

### A. *The Value on the Effective Date of What ECC Will Receive or Retain Under the Plan*

■ A trial court judgment on appeal is "final" in California for purposes of execution, but is still subject to increase, decrease, affirmation, reversal or remand. This creates substantial uncertainty as to how much the HOA will have to pay ECC to satisfy the judgment, but for purposes of this opinion, the amount of the amended judgment ($7,154,544.70) will be used.

The Plan proposes to pay ECC 100% of its claim, plus interest of 1.82% (the federal judgment interest rate as of August 6, 2002, which was the week that the judgment was entered), through a supplemental assessment on all homeowners that will be deposited in a sinking fund for ECC's benefit. At the conclusion of all state court litigation affixing ECC's claim, the monies in the sinking fund will be transferred to ECC. Thereafter, ECC will receive $107,000 per quarter through January 1, 2024. The Plan also provides "supplemental payments," defined as the annual amounts (up to $50,000 per year) necessary to make sure that ECC is paid

---

4. I have found no case on point as to the standard to be used when the plan contains substantial uncertainties, so am adopting the one stated in *United Savings Assn. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375–6, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988), which requires a reasonable possibility of a successful reorganization and is more beneficial to the Debtor than demanding probable success.

the full amount of its judgment at 1.82% interest over the life of the Plan. ECC will have a security interest in and receive the proceeds from any third-party litigation. Any judgment balance will be paid by January 31, 2024. This is a maximum payment stream (exclusive of any third party recovery and without any deduction for costs) of $8,652,612.42, which would pay off the entire judgment at 1.82% interest on April 1, 2022.[5]

Based on the Supplemental Declaration of Bruce Ballenger, the appropriate discount rate for the Plan's stream of payments is 9.25% and for a court-supervised collect of the judgment is 10.5%; ECC has put forth no contrary evidence. Thus, the net present value of the proposed Plan payments to ECC (exclusive of third party recoveries and costs) is $4,766,719.03, based on a judgment of $7,154,545. Since nothing more would be owing to ECC under the Plan, this is the maximum that it would receive or retain as of the effective date.

### B. *The Value that ECC Would Receive or Retain if the Debtor Were Liquidated Under Chapter 7 on the Effective Date*

#### 1. *Recoveries from the Estate*

In Exhibit "A" of the disclosure statement, the Debtor lists the following six assets:

1. Cash assets—$1,007,933;
2. Golf cart—$1,000.00;
3. Office equipment—$1,000.00;
4. Pre-paid legal expenses—$257,500.00;
5. Pre-paid insurance—$39,362.00; and

6. Third-party litigation proceeds—Unknown.

The most recent financial statement, provided at the April 21, 2003 hearing, showed cash assets of $769,761. It appears that this is a rolling number and I assume that the cash assets are a combination of assessments and reserve funds, whose use may be limited by law.

The third party litigation proceeds are uncertain at best. The Debtor has just filed suit against State Farm Insurance and it is anticipated that it will take years before that matter is concluded. At this point even the Debtor cannot estimate the value of the third party litigation, which also includes pre-petition claims against a variety of former directors, professionals and individuals. ECC questions the viability of these actions. As proposed in the Plan, if there is a recovery from the third party litigation, the net proceeds will be subject to ECC's lien. I have no evidence to allow me to value these third party claims as of the effective date or even to anticipate whether a chapter 7 trustee might pursue them, sell them to an outsider or to the defendants in those actions, abandon them, or transfer them to ECC for an agreed amount or a setoff against the judgment.

Assuming that all assets that could be liquidated were sold by the trustee, ECC would only receive its prorata share in priority order. The disclosure statement shows about $250,000 in chapter 11 administrative claims, $24,000 in unsecured claims (exclusive of that of ECC), and a secured SBA loan, which will affect the amount of available cash. Chapter 7 administrative expenses will also eat into the

**5.** The calculation spreadsheets are in the Court's file as "Calculations Concerning Debtor's Plan." One of the difficulties in the calculations is that the date and amount of the ultimate judgment is not yet known. For purposes of this opinion, the maximum supplemental payment of $50,000 per year is used, which would pay off the current judgment at 1.82% interest 21 months before the end of the proposed Plan.

distribution. Thus the ECC distribution under chapter 7 would undoubtedly be substantially less than $500,000, leaving ECC with a large, unsatisfied judgment. For purposes of calculation, however, ECC will not be given "credit" for monies that it might receive from a trustee, which benefits the Debtor in my comparison of present value received or retained by ECC from a hypothetical chapter 7.

### 2. The Value of What ECC Would Retain After Liquidation

While the current assets would be liquidated and distributed by the chapter 7 trustee, future monies collected from the homeowners are not property of the estate, but they are subject to execution by ECC.

### a. Power of the HOA Board to Assess

It is the interaction of the power of the HOA board to assess and the limitations of that power which creates one of the two major issues of statutory interpretation in this case. Another is the power of the court to override the assessment limitations of the board.

The HOA is required to comply with the provisions of the Davis–Stirling Act. Each common interest development must be managed by a community association, which is required to prepare a budget and conduct meetings in a particular manner.[6] Association funds are to be maintained in certain types of financial institutions, must be accounted for in specified ways, and cannot be commingled.[7] Unless otherwise provided in the declaration of the develop-

ment, the association is responsible for "repairing, replacing, or maintaining the common areas" and for levying assessments on the members "sufficient to perform its obligations under the governing documents" and under the Davis–Stirling Act.[8]

There are three types of assessments that the homeowner association can make: regular assessments, special assessments, and reserve assessments. Regular assessments are "to defray expenses attributable to the ownership, operation and furnishing of common interests by the Association;"[9] special assessments are for "capital expenditures (as distinguished from assessments to pay ordinary operating expenses);"[10] and reserves may only be spent for the "repair, restoration, replacement, or maintenance of, or litigation involving the repair, restoration, replacement, or maintenance of, major components which the association is obligated to repair, restore, replace, or maintain and for which the reserve fund was established."[11]

While the assessments can be increased in an unlimited amount if the homeowners agree (so long as the money collected is used as described above), absent that consent the board may enhance the annual regular assessment in an amount "no more that 20 percent greater than the regular assessment for the association's preceding fiscal year," and it may not "impose special assessments which in the aggregate exceed 5 percent of the budgeted gross ex-

---

6. Cal. Civ.Code § 1363 (West 2003).

7. *Id.* § 1363.2.

8. *Id.* §§ 1364(a), 1366(a).

9. Cal.Code Regs. Admin. tit. 10, § 2792.16 (2003).

10. In *Critical Assessment: The Financial Role of Community Associations,* James L. Wino-

kur defines a "special assessment" as a "single assessment for the purpose of discharging a capital or extraordinary expense." The special assessment can be payable in more than one payment. 38 Santa Clara L.Rev. 1135, 1170 (1998).

11. Cal. Civ.Code § 1365.5(c)(1).

penses of the association for that fiscal year." [12] In this case the homeowners have agreed to the special assessment proposed in the Plan both by vote at a special meeting and by the acceptance of Class 7.

### b. Using Court Process to Collect

The assessment limitation can be overridden for an emergency situation. The term "emergency situation" has only three definitions in the Davis–Stirling Act, each of which starts with "[a]n extraordinary expense." [13] ECC relies on the first definition, which states that an emergency situation includes, "[a]n extraordinary expense required by an order of a court." The other two provisions clearly relate to health and safety issues: (1) to repair and maintain "where a threat to personal safety on the property is discovered;" (2) to repair and maintain something the board could not reasonably have foreseen at the time of the budgeting process. In context, it appears that the "order of the court" also should be limited to health or safety issues or where the board must act but there is inadequate time to obtain the quorum to pass an assessment in excess of a 20% increase. But the recent legislative history indicates that interpretation of an "order of the court" is broader than that.

When a creditor obtains a large judgment against a homeowner association, unless the parties agree to a payment plan, the judgment creditor may ask the court to appoint a receiver or make some other order in aid of collection. Using a receiver in aid of execution is expensive and should be done "cautiously and only where less onerous remedies would be inadequate or unavailable." [14] Although the receiver is an agent of the judgment creditor rather than an officer of the court, the appointment is made by judicial discretion and the receiver continues under the direction and control of the court. [15]

The actions of the receiver in *Simi Valley Le Parc H.O.A. v. ZM Corp. ("Le Parc")* [16] triggered legislation to prevent unlimited collections in payment of a judgment against a homeowner association. After the Le Parc bankruptcy case was dismissed due to the inability to confirm a plan, the Superior Court ordered the association board to levy an emergency assessment to satisfy the judgment and appointed a receiver to collect the development's regular and special assessments. Eight months later, the county health inspector closed the swimming pool and there were threatened utility shutdowns. Some homeowners lost their homes to foreclosure because they could not pay the assessment, while the value of other homes declined and the assessed value of the complex dropped dramatically. As a result of this draconian collection method, the legislature amended the statute to provide a set of exemptions for regular assessments "only to the extent necessary for the association to perform essential services, such as paying for utilities and

---

12. *Id.* § 1366(b).

13. *Id.*

14. *Morand v. Super. Ct. for City and County of San Francisco*, 38 Cal.App.3d 347, 351, 113 Cal.Rptr. 281 (3 Dist.1974).

15. *Id.* at 350, 113 Cal.Rptr. 281.

16. Ventura County Super. Ct. Case No. CIV 159037. The facts of *Le Parc* in the Bankruptcy Court are available in the records of Central District of California Case No. SV 97–20190. The assertions of the actions taken after dismissal of the bankruptcy case come from AB 1859 Assembly Bill Analysis for the Assembly Committee on Housing and Community Development for hearing on April 26, 2000. The Order for the homeowner association to specially assess for the ZM judgment was filed with this Court on April 4, 2003 as an exhibit to ECC's objections to the Plan confirmation in this case.

insurance." [17] However, the original suggestion by Assembly Member McClintock that Cal. Civ.Code § 1366(b)(1) be amended to read "[a]n extraordinary repair or maintenance expense that arises from an order of a court" was withdrawn and this provision continues with no limitation to repair or maintenance items.

The legislative reaction to the receiver's methods in *Le Parc* demonstrates an intent that collection against future assessments by a homeowner association should be reviewed and monitored by the court to make sure that there is a balance between the right of the creditor to collect and the needs of the homeowners. For the court to allow a receiver or commissioner to squeeze every cent out of the property without providing for required maintenance would conflict with this obligation.

How the Superior Court might supervise collection of a large judgment against a homeowner association was demonstrated by Judge Richard B. Wolfe of the Superior Court, who issued an extensive draft memorandum of opinion on May 8, 2003 (the substance of which he later adopted in his ruling) in the case of *Klipa v. James F. O'Toole Co., Inc.*[18] Though Judge Wolfe's decision is not binding on me, his thoughtful analysis is of great assistance for it indicates the value of what ECC would retain as a judgment creditor seeking to collect its judgment through the Superior Court.

In *Klipa,* the judgment creditor sought a court order that the homeowner association assign all or a part of its monthly assessments directly to the creditor and further that the court require the associa-

tion to levy an emergency assessment sufficient to satisfy the judgment. First Judge Wolfe found no barrier to an order assigning assessment proceeds to the judgment creditor and then he determined that Civ.Code § 1366(b)(1) allowed the homeowner association to levy an emergency assessment to satisfy an order of the court and that a judgment against the association "is, in and of itself, an 'emergency' expense." Because a judgment is an "order of court," it, "by definition, constitutes an 'extraordinary expense.' " [19]

Finding no guidance in the statute for setting the proper amount of an assessment,[20] Judge Wolfe asserted that there are two policies that need to be considered and enforced: the right and power of the association to govern itself and the legal obligation of the association to pay judgments against it. To that end, Judge Wolfe ordered the association to convene a homeowner's meeting to "provide for a meaningful emergency assessment so as to satisfy the outstanding judgment in favor of judgment creditor." [21] While he did not set an amount or time frame for payment and he noted that the court should defer to the board's authority and presumed expertise as stated in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.,*[22] he required the homeowners to act in good faith (such as not providing a dollar a year).

Thus it appears likely that the Superior Court would order the HOA to propose an emergency assessment to satisfy the judgment and hold the board (and perhaps the members) in contempt if they failed to

---

**17.** Cal. Civ.Code § 1366(c).

**18.** Los Angeles Super. Ct. Case No. LC050749.

**19.** *Id.* at 26–27 (emphasis deleted).

**20.** *Id.* at 11–12.

**21.** *Id.* at 32.

**22.** 21 Cal.4th 249, 265, 87 Cal.Rptr.2d 237, 980 P.2d 940 (Cal.1999).

provide such a proposal. Presumably if the court felt that the proposal was not in good faith, it could order yet another proposal and so on until the HOA presented one that the court could accept, or the judge could make an assignment order or appoint a receiver or commissioner.[23]

### c. *The Maximum Amount to Which ECC is Entitled*

ECC's treatment under the Plan is an attempt by the Debtor to use the bankruptcy process to convert a state judgment into a federal one and thereby repay it at a lower rate of interest. I could find no case discussing the effect of § 1129(a)(7) when the debtor is not entitled to a discharge under chapter 7 either because it is not an individual[24] or because it owes a non-dischargeable debt.[25] Further, the cases dealing with the post-petition interest rate focus on solvent debtors.

For example, the recent Ninth Circuit opinion in *In re Cardelucci*[26] deals with the federal versus state interest rate issue, but its holding is specifically limited to the hypothetical distribution by a trustee in a solvent chapter 7 case and it never discusses the issue or effect of a possible discharge in chapter 7.[27] *Carde-*

*lucci* interprets the language of § 726(a)(5) that requires interest to be paid creditors of a solvent chapter 7 estate "at the legal rate from the date of filing of the petition..." to specifically mean that the federal interest rate for judgments must be used, even if a creditor received a state court judgment prior to bankruptcy. The Court of Appeals—relying on the policy statement in *In re Beguelin*[28]—found that "the interests of 'fairness, equality, and predictability in the distribution of interest on the creditors' claims' as well as the interest in applying federal law to federal bankruptcy cases, required application of the federal judgment rate approach."[29] And although this might lead to inequitable results in some situations, the language in § 726(a)(5) requiring " 'interest at *the* legal rate' " (emphasis added) "is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court."[30]

The holding in *Cardelucci* limits the application of judicial discretion to prevent a detriment to a creditor or a windfall to the debtor, but only if the debtor is solvent. The limitation does not exist in the present case since § 726(a)(5) does not apply to the

---

**23.** Kenneth M. Miller and Kathleen M. DeLaney, Can Judgments Against Homeowner Associations Nab Homeowners?, Cal. Litig., J. Litig. Sec., Cal. State Bar, Vol. 15, No. 1 (2002). It is interesting to note that the appointment of a receiver is not mentioned as an effective tool in this article; however the authors do discuss the appointment of a commissioner under Cal. Civ. Proc. § 187 to carry out the statutory duties of the corporation's officers in order to levy and collect a special assessment.

**24.** § 727(a)(1).

**25.** The cases dealing with non-dischargeable tax debt do not rely on § 1129(a)(7).

**26.** 285 F.3d 1231 (9th Cir.2002), *cert. denied,* 537 U.S. 1072, 123 S.Ct. 663, 154 L.Ed.2d 566 (2002).

**27.** The confirmed plan in *Cardelucci* provides that the confirmation order will act as a discharge of that debtor. And although it is possible that the state court judgment obtained by the objecting creditor in that case may have qualified as a non-dischargeable debt under § 523(a)(6), no adversary proceeding was ever filed. *See In re Cardelucci*, United States Bankruptcy Court for the Central District of California, Case SA 98–14797 RA.

**28.** 220 B.R. 94, 100 (9th Cir. BAP 1998).

**29.** *Cardelucci,* 285 F.3d at 1234.

**30.** *Id.* at 1236.

HOA's Plan and § 1129(a)(7) does not have any equivalent language to that section. Thus, to determine the applicable rate of interest, I need to look at the underlying policies of the Bankruptcy Code itself rather than only those of § 726(a)(5).

■ Various policies exist (and to some extent conflict) in the bankruptcy law, but the two main goals are (1) to "provide a collective forum for sorting out the rights of the various claimants against assets of a debtor where there are not enough assets to go around" and (2) to provide "for some sort of financial fresh start for certain debtors."[31] As part of this policy, non-individuals are treated less generously in chapter 7 than are human beings, who are allowed to transfer their non-exempt property to a trustee and walk away from all debts except those specifically designated as non-dischargeable under § 523(a). Thus the right to collect the debt from a non-individual trumps the fresh start of that entity.

This need to balance the right of the creditor to collect against the right of the debtor to obtain a clean slate is an integral part of the decision of whether to provide interest and at what rate. "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receiv-ership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."[32]

While § 726(a)(5) is an attempt to treat pre-judgment and post-judgment creditors the same when distributing the assets of the estate and to prevent an administrative nightmare for the chapter 7 trustee,[33] once those assets have been distributed and no discharge is possible, the bankruptcy court has no further interest in limiting the action of the creditors whose debts are still unpaid. The debtor should not receive the benefits conferred by discharge when no discharge is permitted.

In general, chapter 7 results in the liquidation of non-individual debtors since there are no exemptions to allow them to maintain assets or other property.[34] In most cases this means that no debtor entity would remain from which ECC could collect. But a homeowner association is unique, since California law requires that it continue to exist and collect monies from the homeowners and that only a portion of those amounts are exempt from execution. Therefore a homeowner association would survive chapter 7 and so would its liabilities, including this judgment, which would continue to accrue interest at 10%.[35]

---

**31.** Epstein, David G., Steve H. Nickles, and James J. White, *Bankruptcy* Vol 1, § 1–2 (West 1992), citing Max Radin, The Nature of Bankruptcy, 89 U. Pa. L.Rev. 1, 3–4 (1940) and Elizabeth Warren, Bankruptcy Policy, 54 U. Chi. L.Rev. 775, 785 (1987).

**32.** *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946), *rehearing denied,* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947). Some of the holdings of this case were superceded by the Bankruptcy Act of 1978, but the general statement of policy contained therein continues as guidance.

**33.** *Cardelucci,* 285 F.3d at 1235–36.

**34.** § 522(b).

**35.** Though *McClellan v. Northridge Park Townhome Owners Assn., Inc.,* 89 Cal.App.4th 746, 107 Cal.Rptr.2d 702 (2 Dist.2001), *review denied* (2001), never deals with the necessity of a homeowner association—finding on the facts that the new entity was a mere continuation of the prior homeowner association—some entity must comply with the Davis–Stirling Act and do all the same things as the original homeowner association. Since the HOA cannot be liquidated and it or its alter ego must continue to operate, there will be a source of repayment for creditors even after the trustee administers and distributes all assets of the estate. This leads to a different

#### d. *Amount Available*

Significant problems arise in dealing with the rights of the parties when there is a large judgment against the HOA. As noted by Judge Wolfe, while the Davis–Stirling Act creates some safeguards to the HOA and gives the court some powers, it does not describe a well-defined collection program.

Whether collected by emergency assessment, special assessment, execution or receiver, there is a maximum amount of money that is available to pay toward this judgment at any given point in time and still provide for the safety and maintenance of the property. It can be expected that this amount will shift due to the decreased value of the dollar as inflation occurs (so more dollars can be assessed since they are worth less) and the need for large outlays as the complex ages, there are natural disasters, or other unforeseen circumstances occur (so that a larger segment of the assessments will have to be committed to maintenance and repair of the property). I do not have the luxury of dealing with events as they occur but, if possible, must make a decision based on the present situation and interpolate what might happen over the years in order to determine the present value of what ECC would receive or retain as of the effective date.

■ The parties agree that of the $721,908 budgeted as a regular assessment for 2003, $545,268 is "essential" as that term is used in Civ.Code § 1366(c), and therefore exempt from execution. Of the remaining $176,640, $120,000 is for legal costs, which presumably will not continue at that rate into the future. The $56,640

balance either covers services that the association feels it can do without (i.e., gardening extras) or that individual homeowners will provide (i.e., pool/spa services).

Beyond the regular assessment, there is an additional sum of approximately $428,000 that the homeowners and management believe can be collected each year by special assessment without negatively impacting the value of the property or the individual homeowners. Thus, beginning in 2004, the HOA can collect $600,424 per year beyond the essential portion of the regular assessment and the ongoing special assessment for the SBA. It is not unreasonable to assume that if there were no bankruptcy, the Superior Court would require the HOA to collect and pay *at least this much* to ECC. Excluding any payment that ECC might receive from the trustee if the case were in chapter 7, this would result in the payment over 20 years of $12,060,000, with a net present value of $5,282,555 for the 20 year stream of payments. At the end of 20 years, ECC would be owed almost $12 million more. If it properly renews the judgment, ECC can continue to enforce it until it is paid in full, with each renewal adding unpaid interest to the principal amount.[36]

While a $12 million judgment in 2024 will not be worth what it is in 2003, it still would have substantial value, particularly since it can't be discharged in bankruptcy and will be supported by a stream of payments into the future. Of course, ongoing court supervision will mean that payments go up (to overcome the negative amortization factor) or down (to deal with emergencies). But I do not need to find the exact value of what ECC retains, for under any

---

result than *In re General Teamsters Warehousemen and Helpers Union, Local 890,* 265 F.3d 869 (9th Cir.2001), where the future union dues was not seen as an asset because the union could later cease to exist.

**36.** Cal.Civ.Proc.Code §§ 683.020, 683.110, 683.120, 683.150, 685.010 (West 2002).

scenario ECC does not receive or retain under the Plan as much as it would under a chapter 7 liquidation.

While this means that I cannot confirm this Plan, it does not suggest that no plan can be confirmed just because it covers a long period of time or contains some uncertainty as to future events. But it is clear that a confirmable plan must provide for full payment of ECC's claim with 10% interest and with accrued and unpaid interest being added to the principal every 10 years.

When that Plan is proposed, the parties may wish to consider the following:

(1) Since the HOA acknowledges that it can collect at least $30,000 per month without interfering with its responsibilities— that being the amount of the nonessential services and the emergency assessment— the Superior Court would require that initially the Debtor must pay ECC at least that much.

(2) The Plan proposed by the Debtor need not pay off the judgment at the identical rate as the Superior Court would order, but the judgment must be paid off in full (calculated at 10% accruing interest) by the end of the Plan. Further the length of the Plan should not exceed 20 years from the end of all appeals.

(3) Given the length of the Plan, some mechanism for changes in payment amount must be built into the repayment process unless the proposed payments completely amortize the judgment over the life of the Plan without any need to determine later increases in payments or to pay off a balloon at the end.

(4) Rather than waiting for years to ascertain the viability and value of the third party actions, the parties might wish to consider some form of estimation. In determining the best interest test, I need

only find the likely result, not the definite one.

### III. *OTHER ISSUES*

The remaining issues of good faith (§ 1129(a)(3)), the fair and equitable test (§ 1129(b)(2)(B)), and feasibility (§ 1129(a)(11)) need not be resolved at this time. Should the Debtor propose a Plan which conforms with § 1129(a)(7), I will look at each of these issues (and any new ones raised by the proposed Plan).