In re SMEC, INC., Debtor.

Susan R. LIMOR, Trustee, Plaintiff,

v.

WEINSTEIN & SUTTON
et al., Defendants.

No. 2:92–0095.

United States District Court,
M.D. Tennessee,
Northeastern Division.

Oct. 27, 1993.

Roy Clarence DeSha, Jr., Crocker & De-Sha, Nashville, TN, F. Dean Armstrong, Flossmoor, IL, for Susan R. Limor.

Joyce M. Grimes, Ortale, Kelley, Herbert & Crawford, Nashville, TN, for Weinstein & Sutton & Louis Weinstein.

Raymond Dale Bay, Maria M. Salas, Lewis, King, Krieg & Waldrop, Nashville, TN, for Ezra Sutton.

## MEMORANDUM

WISEMAN, District Judge.

Before the court are the defendants' motions for summary judgment. To decide these motions, the court must decide whether a federal district court sitting pursuant to its bankruptcy jurisdiction must apply the choice of law provision of the forum state or whether it may make an independent choice of law. It is this court's conclusion that the forum state's choice of law provision is not binding in such a case, but rather the law of the state with the greater interests in the matter should control. Applying this test to the facts of the present case, New Jersey law controls. The plaintiff's legal malpractice action is not time-barred under New Jersey law; the defendants' motions shall be denied.

### I

The origins of this lawsuit are found in the high tech, high stakes field of medical care products. The fight between two players in this field—over the care of our hearts and the associated dollars—led to the current dispute between the player who lost that battle and the lawyers accompanying that player in defeat.

The first key player is Datascope Corporation. Datascope is a large manufacturer of medical devices, one of these devices being an intra-aortic balloon catheter (an "IAB"). Essentially, the IAB is inserted into the aorta of a person with a failing heart to aid in blood circulation. All IABs were surgically inserted prior to the late 1970s, when Datascope developed a new type of IAB, known as the "twisting IAB," that permitted non-surgical, percutaneous insertion. Datascope obtained a foreign patent, and later a U.S.

88

patent, on this twisting IAB and quickly became the industry leader in IABs.[1]

The second key player is Schiff Medical Equipment Company, Inc. ("SMEC"), which was a New Jersey corporation founded in 1968 by Mr. Peter Schiff. SMEC manufactured and sold medical devices related to the treatment of cardiac disorders. In 1976, SMEC moved all of its operations to Cookeville, Tennessee.

By 1980 SMEC had developed two versions of the percutaneous IAB that SMEC believed were significant improvements over Datascope's version: one of SMEC's versions was a twisting IAB and the other was a folded, or prewrapped, IAB. The latter design was a radical change from that of the twisting IAB, and so SMEC delayed its marketing of this product out of fear the market would not readily accept it. Instead, SMEC sought legal advice as to whether its twisting IAB was a sufficient improvement over Datascope's version to avoid patent problems; if so, SMEC would go forward with the marketing of this product. The defendants—a New Jersey legal boutique specializing in intellectual property and the two members of this firm—and particularly individual defendant Weinstein, opined to SMEC that it's product did not literally infringe on Datascope's patents.[2] SMEC accordingly went forward with the marketing of its twisting IAB; SMEC forsook further development of its folded IAB.

Datascope did not share SMEC's, nor SMEC's lawyers', belief in the innovativeness of SMEC's design and filed a patent infringement suit on December 30, 1981 in the District of New Jersey. The district court only partially shared SMEC's belief. On September 25, 1984, the district court ruled that, although SMEC's design did not literally infringe on Datascope's patent, the two IABs were sufficiently similar to find infringement under the doctrine of equivalents. *See Data-*

*scope Corp. v. SMEC, Inc.,* 594 F.Supp. 1306, 1314 (D.N.J.1984). SMEC appealed, but on November 1, 1985, the Federal Circuit affirmed the district court's decision. *See Datascope Corp. v. SMEC, Inc.,* 776 F.2d 320, 325 (Fed.Cir.1985). The defendants, and particularly individual defendant Sutton, represented SMEC throughout both the trial and appeal.

From 1986 to 1990 was the damages phase of the SMEC–Datascope lawsuit. The defendants did not represent SMEC in this phase of the suit.[3] On January 19, 1988, the district court ruled that SMEC owed Datascope royalties in the amount of $113,440.05. The court, finding no willful infringement, declined to award lost profits, treble damages, or attorney fees. *See Datascope Corp. v. SMEC, Inc.,* 678 F.Supp. 457, 465 (D.N.J. 1988). Datascope appealed, and the Federal Circuit reversed on July 6, 1989, finding willful infringement and holding that Datascope was thus entitled to lost profits. *See Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 828 (Fed.Cir.1989). The case was remanded for calculation of lost profits, and on February 1, 1990, the district court arrived at a figure of $3,277,963.96. On August 3, 1990, this amount was increased to $4,672,629.96 after prejudgment interest was added. *See* Pl.'s Ex. C, ¶ 27.

On August 13, 1990, SMEC filed for Chapter 11 bankruptcy in the Middle District of Tennessee, seeking to avoid seizure of its assets by Datascope. On December 20, 1990, the present plaintiff, Ms. Susan Limor, was appointed Trustee. Ms. Limor remained Trustee after the case was converted to Chapter 7 on February 11, 1991 and filed this action on behalf of the estate on August 12, 1992. The case was originally before the bankruptcy judge, but the reference was withdrawn so that this adversarial proceed-

---

1. *For a more detailed discussion of the invention and operation of the IAB, see Datascope v. SMEC, Inc.,* 594 F.Supp. 1306, 1307–09 (D.N.J. 1984).

2. Defendant Weinstein actually twice gave this opinion. First, in 1980, Mr. Weinstein opined that marketing the twisting IAB would not in-

fringe on Datascope's foreign patent, and then in 1981 he opined that further marketing of the IAB would not infringe on the U.S. patent issued to Datascope in that year.

3. Defendant Weinstein did provide some advice on patent matters through August of 1990.

ing could be heard in district court.[4]

The Trustee's complaint alleges that as a result of the defendants' legal malpractice—specifically, defendants' failure to counsel and advise on possible infringement under the doctrine of equivalents—SMEC incurred the debt owed to Datascope. Thus the defendants should be made liable for the amount owed to Datascope plus any other damages incurred as a result of their malpractice. In sum, $6 million dollars and attorney fees are sought to compensate the estate for alleged wrongs by the defendants. The defendants deny any negligence and assert that this action is time-barred.

## II

This case presents a three-tiered decision process. First, the court must decide which choice of law provision a district court, sitting by virtue of its bankruptcy jurisdiction, should apply. Second, the court must apply this provision to decide which state's law on legal malpractice should control. Finally, the court must apply the chosen malpractice law to decide whether the present action is time-barred.

### A. Controlling Choice of Law Test

The first question presented—which choice of law test should control—would be uncomplicated if this were a diversity case, for this court would be obligated to apply the forum state's choice of law provision. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *see also Electric Power Bd. v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th Cir.1989). However, given that this court's jurisdiction is here founded on federal bankruptcy law, this rule does not necessarily apply. Different concerns are present in bankruptcy cases that may make mechanical application of the forum state rule inappropriate. Whereas state policies might be thwarted by "the accident of diversity of citizenship" if a federal court sitting in diversity did not apply the substantive law of the forum state, *Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021, there is no equivalent concern in a bankruptcy case. A

bankruptcy court sits pursuant to a special grant of federal jurisdiction, not through an accident of geography, and its mission is to implement federal policy.

Notwithstanding the federal nature of bankruptcy law, the Bankruptcy Code depends on state law for the definition of numerous rights relevant to proceedings under its authority (e.g., the definition of property rights). *See Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979); *In re All Chem. Isotope Enrichment, Inc.*, 127 B.R. 829, 837 (Bankr. E.D.Tenn.1991). Unfortunately, the Code provides no guidance on the manner in which conflicts of state law should be resolved. In the absence of any such direction, some courts have resorted to the rule in diversity of applying the choice of law provision of the forum state. *See In re Velasco*, 13 B.R. 872, 874 (Bankr.W.D.Ky.1981); *In re Maplewood Poultry Co.*, 2 B.R. 550, 553 (D.Me.1980). Other courts have concluded that they may make an independent choice of law, and have usually done so by assessing with which state the action in question has the most significant contacts. *See In re Kaiser Steel Corp.*, 87 B.R. 154, 157–60 (Bankr.D.Colo.1988); *In re Barney Schlogel, Inc.*, 12 B.R. 697, 700 (Bankr.S.D.N.Y.1981); *see also In re Holiday Airlines Corp.*, 620 F.2d 731, 734 (9th Cir.1980); *In re Wallace Lincoln–Mercury Co.*, 469 F.2d 396, 400 n. 1 (5th Cir.1972).

Courts taking the latter approach rely on the Supreme Court's opinion in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In deciding what law to apply to determine a creditor's claim for interest on unpaid interest, the Court observed that

> obligations ... often have significant contacts in many states, so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of

4. *See* this court's Order of Mar. 8, 1993.

the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states.

*Id.* at 161–62, 67 S.Ct. at 239. The Court did not have to make a choice of state laws to decide the claim before it however, and so the above recommendation was only dicta. Nevertheless, several courts have taken these statements as strong evidence of how the Court would rule on the conflicts question if unavoidably confronted with it. *See Kaiser Steel,* 87 B.R. at 158.

Sixth Circuit law on this question is ambiguous. Prior to *Vanston,* the Sixth Circuit took the position that courts sitting in bankruptcy were to apply the choice of law rule of the forum state, *United Constr. Co. v. Milam,* 124 F.2d 670, 671 (6th Cir.1942), and the court of appeals has not revisited the question since. There is good reason to believe, however, that the Sixth Circuit would alter its position today in light of *Vanston,*[5] for *Vanston* drastically changed the terrain of choice of law doctrine in bankruptcy cases. *See In re Ovetsky,* 100 B.R. 115, 116–18 (Bankr.N.D.Ga.1989) (discussing the implications of *Vanston*).

First, statements in *Vanston* strongly indicated the Court's intent to separate bankruptcy jurisdiction from diversity jurisdiction for choice of law purposes. In addition to the statements set out above, the Court noted that

> [i]n determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. *Erie R.R. v. Tompkins,* 304 U.S. 64, [58 S.Ct. 817, 82 L.Ed. 1188] [ (1938) ] has no such implication. That case decided that a federal district court acquiring jurisdiction because of diversity of citizenship should adjudicate controversies as if it were only another state court. See *Holmberg v. Armbrecht,* 327 U.S. 392 [66 S.Ct. 582, 90 L.Ed. 743] [ (1946) ]. But bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.

*Vanston,* 329 U.S. at 162–63, 67 S.Ct. at 240. Thus, the Court twice distinguished the diversity approach to conflicts of law from the approach that should prevail in bankruptcy cases: federal law should first be looked to; if federal law is not dispositive, then look to the law of the state with the most significant relationship to the case. In *Vanston* it just so happened that federal law was dispositive; otherwise, the whole of *Vanston's* choice of law formula in bankruptcy would likely have become law.

Second, the logic of *Vanston* is compelling. In a diversity case, it is presumed that the forum state has the greatest interest in seeing its laws applied. In a federal bankruptcy case incorporating state law, this presumption is untenable. There is no necessary reason to believe that the forum state is the state with the greatest interest in a bankruptcy proceeding. In fact, in today's business world, the location of a debtor may bear little relation to the location of his or her property interests or to the corpus of his or her business dealings. A choice of law rule that looks to the state with the greatest interests in the proceeding acknowledges the complex nature of property and transactions and thereby protects state interests. Oftentimes the forum state will be the state with the greatest interests, but there is no need for such a presumption.

This rule also helps prevent forum shopping by debtors. Rather than allow debtors in the shadow of bankruptcy to restructure or relocate their business dealings in such a way as to gain the benefit of a certain forum's laws, this rule imposes on debtors the laws under which they primarily acted. Likewise, creditors and other parties are not subjected to, or given the benefit of, an unjustified quirk of legal procedure that impos-

---

**5.** Although the court in *In re Revco D.S., Inc.,* 118 B.R. 468 (N.D.Ohio 1990), incorrectly stated that "[t]he Sixth Circuit has not addressed the question of whether a bankruptcy court may apply its own choice of law provisions," that court did correctly state, in this court's opinion, that "if it did, it would still rely on a significant contacts test." *Id.* at 504.

es on them laws under which they rarely or never transacted.

It is true that a bright line rule, such as the forum state rule, has its benefits, most notably its ease of application. But these benefits are bought at the cost of particularity. The special circumstances of a case that may argue against application of the forum state's laws are not given consideration. Preserving particularity, and protecting states' interests and fairness thereby, is ample justification for imposing on courts the possibly more difficult choice of law that may accompany the most significant contacts test.

■ In sum, the choice of law test that this district court sitting in bankruptcy will apply is the most significant contacts test.[6] Were the Sixth Circuit to address this issue today, it would most likely endorse this test. The Supreme Court's *Vanston* opinion and the test's logic argue strongly for its adoption.

### B. Controlling Malpractice Law

The next task for the court is to determine which state has the most significant contacts with this case. Two states have potential interests in the proceeding: New Jersey and Tennessee. Tennessee was the location of SMEC, the debtor. New Jersey was the location of the defendants at all times relevant to this action. To make an "informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states," *Vanston*, 329 U.S. at 162, 67 S.Ct. at 239, the circumstances surrounding the plaintiff's claim must be discussed.

■ The Trustee's complaint alleges legal malpractice and gross negligence on the part of the defendants. The bulk of the actions leading to this claim occurred in New Jersey. The members of the defendant law firm, when providing services to SMEC, were licensed to do business in New Jersey. The president of SMEC, Peter Schiff, contacted the defendants in New Jersey concerning patent counsel. Work performed in connection with the patent infringement opinion primarily took place in New Jersey. The Datascope–SMEC trial occurred in New Jersey.[7] Obviously New Jersey has a strong interest in regulating the conduct of legal business occurring within its borders.

Tennessee, on the other hand, has little interest in applying its malpractice law to the present action. Although SMEC was incorporated in Tennessee in 1982 and did file for bankruptcy within Tennessee's borders, little or none of the defendants' legal activity in question occurred here. Indeed, it is questionable whether a Tennessee state court could have exercised personal jurisdiction over the defendants had SMEC filed a malpractice action before going bankrupt.[8] The effects of the defendants' alleged malpractice were felt in this state, but beyond this there is little to recommend application of Tennessee law.

The nature of the present claim is such that the laws of the state wherein the alleged negligent behavior occurred should be applied. The defendants conducted themselves according to New Jersey's laws and professional codes, not Tennessee's. It would now be odd to judge the defendants' behavior by Tennessee standards.

### C. Timeliness of Action

■ The court must now apply New Jersey malpractice law to the facts of this case

---

6. To the extent that the bankruptcy court in this district came to a different conclusion previously, *see In re Dynamic Enters., Inc.*, 32 B.R. 509, 514 n. 2 (Bankr.M.D.Tenn.1983), that decision is now superseded. The court in the *Dynamic* case resorted to the diversity rule of applying the forum state's substantive law, including its choice of law provision, without any consideration of the *Vanston* case or of the differences between bankruptcy and diversity jurisdiction. Had such considerations been made, this court is convinced a different conclusion would have been reached.

7. These facts are found in Pl.'s Compl., Pl.'s Exs. C & 3, Mem. of Law in Supp. of Defs. Weinstein & Sutton and Weinstein's (Individually) Mot. for Summ.J., and Mem. of Law in Supp. of Def. Sutton's Mot. for Summ.J.

8. Consider, for example, that defendant Sutton denies any connections with the state of Tennessee. *See* Pretrial Statement of Def. Sutton at 2, ¶ 3.

**92**

to determine whether the action is timely. New Jersey has a six-year statute of limitations for legal malpractice actions. N.J.Stat. Ann. § 2A:14–1 (West 1987). This statute begins to run "only when the client suffers actual damages and discovers, or through the use of reasonable diligence should discover, the facts essential to the malpractice claim." *Grunwald v. Bronkesh,* 131 N.J. 483, 621 A.2d 459, 464 (1993). This "discovery rule" has two elements: actual damage and knowledge of fault. *Id.* Actual damage exists once any adverse judgment is entered; the appeals process does not have to have come to an end. *Id.* 621 A.2d at 465. Awareness of possible fault exists once the "plaintiff knows or should know that the damage is attributable to the attorney's negligent advice. Depending on the circumstances, knowledge of fault may occur before or during a judicial resolution of the underlying action." *Id.* at 466.

■ Applying this rule to the present case, the actual damages element was satisfied on September 25, 1984, when the district court in New Jersey entered a judgment against SMEC. Greater evidentiary problems surround the knowledge of fault element, making it more difficult to determine. Nevertheless, taking the evidence in the light most favorable to the plaintiff as we must at this summary judgment stage, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), SMEC's knowledge of possible fault by its attorneys did not arise until judgment was entered against it. Prior to this time, SMEC had no awareness that the defendants might have neglected to consider patent infringement under the doctrine of equivalents. Moreover, the defendants allegedly represented to SMEC that Datascope's complaint was meritless and merely designed to harass SMEC.

On the basis of these facts, the earliest date that the statute of limitations could have begun to run was September 25, 1984. Six years from that date was September 25, 1990. This date is not the final date for filing by the Trustee, however, for 11 U.S.C. § 108(a) provides for an enlargement of time for trustee-initiated actions on behalf of the estate. If the statute of limitations has not run by the date of filing of the bankruptcy petition, the trustee may file an action before the later of (1) the end of the period of limitation or (2) two years after the order for relief. *See* 11 U.S.C.A. § 108(a) (West 1993).

SMEC filed for bankruptcy on August 13, 1990; hence the statute of limitations had not run by the date the petition was filed and § 108(a) is applicable. Therefore, the Trustee had until August 13, 1992 in which to file this action. This action was filed on August 12, 1992, one day before the time for filing expired. By operation of the § 108(a) extension, this action is not time-barred.

### D. Statement of a Tenable Claim

Defendants Weinstein & Sutton and Weinstein individually dispute the sufficiency of plaintiff's evidence of malpractice. The defendants argue that the doctrine of equivalents is a very murky area of law, about which reasonable people disagree, and therefore it is unreasonable to find negligence for failing to advise a client that he or she may be infringing under this doctrine. The plaintiff's response is that a reasonable lawyer would have at least advised SMEC about possible infringement under this doctrine, even if a precise opinion could not be given, so that SMEC would have been fully aware of possible liabilities. This difference of opinion is assessed under well-established standards of summary judgment.

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476–80 (6th Cir.1989). The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Upon meeting this burden, the burden shifts to the nonmoving party, who cannot rest on its pleadings but must present some "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. A dispute about a material fact is "genuine" within the meaning of Federal Rule of Civil

Procedure 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 252, 106 S.Ct. at 2512. The court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513.

■ Plaintiff's evidence is sufficient to go forward with the case. Plaintiff has shown that the defendants failed to advise on infringement under the doctrine of equivalents, and possibly failed to investigate this prospect. Plaintiff offers an expert opinion that a reasonably competent attorney would have advised SMEC on infringement under the doctrine of equivalents. *See* Pl.s' Ex. A. Furthermore, plaintiff has indicated that it was the defendants' unequivocal statement that SMEC's twisting IAB did not infringe on Datascope's that led SMEC to forsake the folded IAB and cast its lots on its twisting IAB. The defendants may well be right that any opinion offered on infringement under the doctrine of equivalents had a fair chance of being wrong, but the plaintiff has made a tenable claim that the failure to advise at all on possible infringement under this doctrine led SMEC to take actions that eventually led to it's downfall. It is too early to conclude that the defendants were not negligent in their service to SMEC.

### III

In summary, a district court sitting by virtue of its bankruptcy power may make an independent choice of law. This choice should be based on an assessment of which state has the most significant interest in the case. In this case, New Jersey's interests outweigh Tennessee's. Under New Jersey law, with the aid of the extension of time provision of 11 U.S.C. § 108(a), the Trustee's action is not time-barred. Finally, the plaintiff has put forward sufficient evidence of malpractice to avoid summary judgment. All of the defendants' motions shall be denied in an accompanying Order.