**In re SEGRE'S IRON WORKS, INC., Debtor.**

No. 96–30081.

United States Bankruptcy Court, D. Connecticut.

March 2, 2001.

John W. Colleran, Colleran & Carboni, P.C., New Haven, CT, for Claimant, Andre Emmerich Gallery, Inc.

James G. Verrillo, Zeisler & Zeisler, P.C., Bridgeport, CT, for Debtor–Objector.

## MEMORANDUM OF DECISION ON OBJECTION TO CLAIM

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This Memorandum of Decision sets forth the rationale for the Court's determination with respect to the referenced contested matter. This matter requires the Court to determine whether a Connecticut statute of limitation renders unenforceable a common law fraud claim against the Debtor. For the reasons stated more fully herein, an order shall enter this day overruling the Debtor's Objection to Claim.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b), and this Court derives its authority to hear and determine the matter on reference from the District Court pursuant to 28 U.S.C. § 157(a), (b)(1). This contested matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B).

### III. FACTUAL AND PROCEDURAL BACKGROUND

The present dispute has its origin in a contest over the authenticity of a monumental work of sculpture, "Two White Dots" (hereafter, the "Work"), attributed to the renowned Modern artist, Alexander Calder (hereafter, "Calder"). The Andre Emmerich Gallery, Inc. (hereafter, "Emmerich") claims that it has been injured by false and fraudulent representations concerning the Work made in writing by the present Debtor, Segre's Iron Works, Inc. (hereafter, "Segre's" or "Debtor"), *inter* *alia.* It is undisputed that Segre's constructed the Work, and then sold it in 1983—seven years after Calder's death. The allegedly false and fraudulent representations made by Segre's were contained in an agreement dated November 18, 1983 (hereafter, the "Agreement"), which attended Segre's sale of the Work to an art dealer residing in North Woodmere, New York. In the Agreement, Segre's represented and warranted the following facts (hereafter, collectively referred to as the "Attribution"), *inter alia,* concerning the Work:

(i) the Work was "conceived and designed" by Calder;

(ii) the Work was "duly commissioned" by Calder to be fabricated by Segre's;

(iii) Segre's fabricated the Work under the "supervision and direction" of Calder; and

(iv) Calder saw the Work as it was being fabricated, but never "signed" the Work prior to his death.

The Work was subsequently sold and resold several times—including an auction sale at Sotheby's—on the strength, at least in part, of the Attribution. The ultimate vendor in this chain was Emmerich, which purchased the Work in 1990, and then sold the same in 1992 to Jon Shirley for approximately $900,000.00. When Mr. Shirley submitted the Work for inclusion in the Calder *catalogue raisonne—i.e.* the authoritative listing of Calder works prepared under the auspices of the Calder Foundation—the Work was rejected on the ground that Steven Segretario, a principal of Segre's, had admitted that the Work had been constructed in 1982, *i.e.* not during the lifetime of Calder. As a result of this information, Emmerich accepted return of the Work from Mr. Shirley and refunded his purchase price.

In 1995, Emmerich commenced a civil action against Segre's, *et alius,* in the United States District Court for the Southern District of New York (hereafter, the

"Civil Action"), pleading a cause of action sounding in common law fraud (hereafter, the "Claim"), and praying for a monetary judgment in excess of $1,000,000.00. The Civil Action was stayed by the commencement of the instant bankruptcy case in this Court on January 11, 1996 (hereafter, the "Petition Date").

Emmerich has filed a Proof of Claim (Claim No. 7) in this bankruptcy case, asserting an unsecured nonpriority claim in the amount of "$900,000 + interest" (hereafter, the "Proof of Claim"). In response to the Proof of Claim the Debtor filed its Objection to Claim (Doc. I.D. No. 26) (hereafter, the "Claim Objection"), thereby initiating this contested matter.

## IV. DISCUSSION

■ The Debtor bears the burden of proof in this claim allowance matter since Emmerich's Proof of Claim "constitute[s] *prima facie* evidence of the validity and amount of the claim." Fed. R. Bank. P. 3001(f). Section 502 of the Bankruptcy Code governs the allowance of claims, and provides in relevant part as follows:

(a) A *claim* ..., proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest... objects.

(b) ... if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is *unenforceable against the debtor* and property of the debtor, under... applicable law for a reason other than because such claim is contingent or unmatured;

\* \* \* \* \* \*

11 U.S.C. § 502 (1996) (emphasis supplied). Thus, the viability of Emmerich's

Proof of Claim turns on, *inter alia,* (i) whether Emmerich in fact possesses a "claim" within the meaning of the Bankruptcy Code and, if so, (ii) to what extent that claim is "enforceable" against the Debtor under "applicable law".

### A. Does Emmerich Hold a Claim?

■ In bankruptcy, the term "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, ... [or] disputed...." 11 U.S.C. § 101(5)(A) (1996). The United States Supreme Court has observed that Congress intended by this language to adopt the broadest available definition of "claim". *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991). Hence this Court concludes that, at the very least, Emmerich holds a disputed claim against the Debtor.[1]

### B. Is the Claim Enforceable?

■ The enforceability of a pre-petition claim against a bankruptcy estate is determined on the strength of the claim's factual and legal underpinnings as they existed immediately prior to the commencement of the bankruptcy case. Truly, "[p]arties are in bankruptcy court with their rights and duties already established...." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 169, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (Bankruptcy Act case; concurring opinion of Justice Frankfurter). Further, it is now well-settled that, except in limited instances where federal bankruptcy law specifically preempts non-bankruptcy law, the viability of claims against a bankruptcy estate is determined by reference to the applicable *non-bankruptcy* law under which they were created. *Raleigh v. Illinois Dep't. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000).

The sole basis of the Claim Objection is the Debtor's assertion that Emmerich's

---

1. In truth, the Debtor is not alleging that Emmerich lacks a "claim". Rather, by relying solely upon a statute of limitations de-

fense, the Debtor is asserting that Emmerich's claim is not *enforceable* in this Court under applicable law.

Claim is presently unenforceable against him because his liability on the Claim is governed by, and was cut off by Section 52–577 of the Connecticut General Statutes[2]—Connecticut's statute of "limitation"[3] with respect to tort actions. By contrast, Emmerich contends that its Claim is enforceable because its rights against the Debtor are governed by New York law, under which its assertion of the Claim through the Civil Action was timely under NYCPLR §§ 213(8), 203(g)—New York's statute(s) of limitation for fraud.

In light of the foregoing positions, the fundamental question before the Court is whether C.G.S. § 52–577 is applicable to the Claim. Resolution of that question requires this Court to make a choice of the limitations law—Connecticut or New York—which is to govern the Claim.

### 1. Choice of Law.

#### a. Federal common law.

■ In ascertaining the law under which a claim was created, a bankruptcy court—sitting by virtue of the jurisdictional grant of 28 U.S.C. § 1334—does not mechanically apply the outcome-determinative law of the state where it sits, as it might were it a district court sitting by virtue of diversity jurisdiction. *Vanston*, 329 U.S. at 162, 67 S.Ct. 237. Rather, the bankruptcy court should employ its power to apply and create federal common law by exercising an *independent judgment* as to choice of law. *Id.*, see, e.g., *In re SMEC, Inc.*, 160 B.R. 86, 89–91 (M.D.Tenn.1993). In general, a bankruptcy court's choice of applicable law "requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states." *Vanston*, 329 U.S. at 162, 67 S.Ct. 237.

■ The Second Circuit Court of Appeals has recently instructed that the general federal common law choice-of-law rule directs a court to apply the law of the jurisdiction having the greatest *interest* in the litigation. *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (2d Cir. 1992). A court's goal under this paradigm is to evaluate each jurisdiction's contacts with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent. *Id.*

■ In the pending matter the Debtor–Objector is a Connecticut resident. However, the claimant is a New York entity, and there is no evidence before the Court suggesting that the relevant acts giving rise to the Claim occurred in any State other than New York. Specifically, the Agreement, and therefore the Attribution, was made in North Woodmere, New York; all subsequent sales of the Work appear also to have occurred in New York between New York entities. Finally, the Court takes judicial notice of the incontestable fact that New York City hosts a premier, if not the preeminent, fine arts market in the United States. New York State's overriding interest in protecting and policing the integrity of that market under its own laws is self-evident. Connecticut's interest in protecting its residents from the application of New York's fraud laws is slight by comparison. Accordingly, this Court will look to New York's limitations law in assessing whether the Claim is presently enforceable.

#### b. Equitable principles.

■ The advisability of the Court's selection of New York limitations law is reinforced by a consideration of equitable and other jurisprudential principles endorsed by the United States Supreme

---

2. At all times relevant to these matters C.G.S. § 52–577 provided that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

3. Technically, C.G.S. § 52–577 is a statute of "repose".

Court. *See Raleigh,* 120 S.Ct. at 1957–58; *Vanston,* 329 U.S. at 163, 67 S.Ct. 237 ("bankruptcy courts must administer and enforce the [bankruptcy laws]... under equitable principles"). The unique jurisdictional and statutory context of bankruptcy requires that this Court undergird and overlay its analysis with general equitable principles such as "uniformity, ... fairness and equity." *Vanston,* 329 U.S. at 167, fn. 10, 67 S.Ct. 237. It is fundamentally unfair, and subversive of uniformity, for a debtor to be permitted to defeat a creditor's claim—which was timely prosecuted in, and under the law of, the state with the greatest interest in the dispute—through the simple maneuver of filing a bankruptcy case in a different state where a less generous statute of limitation arguably controls. Allowance of claims against a bankruptcy estate should not depend upon the happenstance or devise of bankruptcy venue. To rule otherwise would encourage forum-shopping by debtors who may contemplate moving a residence, or restructuring business operations to permit a bankruptcy filing in a state with an expired limitations period as to material claims against them. Accordingly, this Court can, and would, exercise its discretion to preclude the result urged by the Debtor here.

In adopting this approach, this Court draws support from *Raleigh*'s endorsement of similar notions of equality and uniformity in a closely analogous context. There, the Supreme Court considered whether the allocation of the burden of proof applicable under state law to a state tax claim could be altered in claim allowance litigation in the Bankruptcy Court. The Court observed that the fact that the automatic stay of Bankruptcy Code Section 362 could be lifted to permit a claim to be liquidated through litigation in a non-bankruptcy forum presented the potential for unequal treatment of a creditor inside and outside a pending bankruptcy case.[4] *Raleigh,* 120 S.Ct. at 1957–58. If the Debtor's arguments concerning the effect of Connecticut law were correct, the same potential for inequality would be present here.

### c. The impact of Koreag.

Despite this Court's conclusion that federal common law supplies the choice-of-law rule governing this matter, the Court would be remiss not to address the Debtor's contention that *Koreag,* instead, provides the authoritative methodology, compelling this Court to select and apply Connecticut choice-of-law rules and limitations law. In *Koreag* a Second Circuit Panel outlined what this Court interprets as a four-step analytical process to resolve an issue of law arising in the context of a bankruptcy case. *See Koreag,* 961 F.2d at 350–51. Under that outline, a court would (1) *characterize* the subject issue as either "predominately founded upon state-created rights [hereafter, a 'State Issue'], or involving important concerns implicating national bankruptcy policy" (hereafter, a "Bankruptcy Policy Issue"); (2) *select* the appropriate choice-of-law rule (in the instance of a State Issue the court would access the choice-of-law rule of the *forum* state, and in the instance of a Bankruptcy Policy Issue it would reference the *federal common law* choice-of-law rule); (3) *utilize* the selected choice-of-law rule to determine which of the possible jurisdictions should supply the substantive rule of decision on the subject issue; and (4) *apply* the selected local substantive law to the facts of the case. *See id.* The novelty of *Koreag* lies in steps (1) and (2), which would compel a court to *choose* a choice-of-law rule based upon issue characterization.

This Court declines to regard *Koreag* as binding authority in the instant matter for several reasons. First, *Koreag*'s analytical

---

4. A court's abstention under 28 U.S.C. § 1334(c) would provide the basis for a similar hypothetical to the same effect.

outline is *dicta*—in that case the Panel did not fully employ a four-step approach. Rather, it bypassed the first and second steps—*characterization* and *selection*—and proceeded directly to the third step—*utilization*—having concluded that the former were unnecessary since each of the possible choice-of-law rules pointed to the decisional law of the same jurisdiction.

Further, the language employed by the Panel in *Koreag* equivocates on whether a court *must* engage in the initial *characterization* step. The Panel muses, "[s]electing the appropriate conflicts rules would thus *seem* to require us to characterize the present issue ... as either predominately founded upon state-created rights, or involving important concerns implicating national bankruptcy policy." *Id.* at 350 (emphasis supplied). Such equivocation is understandable given the fact that (i) the Panel cites only non-binding Bankruptcy Court authority for the proposition that a court should look to the forum state's choice-of-law rules where "the underlying rights and obligations of the subject dispute are defined by state law....", *id.;*[5] and (ii) it was unnecessary for the Panel to characterize the underlying nature of the rights at issue since the choice-of-law rules in the competing jurisdictions were indistinguishable as applied to the dispute in that case.

More fundamentally though, this Court views *Vanston* as *the* controlling authority on the specific claim allowance issues involved in the instant matter. Granted, both *Vanston* and *Koreag* are *dicta* on the specific question at bar. But, to the extent that *Koreag* intended to suggest a bankruptcy choice of law paradigm at odds with *Vanston*, this Court must follow the lead of the United States Supreme Court.

This Court also feels compelled to comment that even if it deemed the *Koreag*

paradigm as binding over that gleaned from *Vanston*, it would still decline to follow *Koreag* here. Rather, the Court would act under the guidance of the overriding equitable principles discussed *supra*, at Section IV.B.1.b. of this Memorandum of Decision, to preclude the Debtor from defeating Emmerich's bankruptcy rights through the happenstance or devise of the venue of the bankruptcy case. Finally, it is far from clear that following *Koreag*'s four-step outline would even lead to claim disallowance. The Court has plotted that analytical path and identified several close legal issues—some raised by the parties, and some not—which the Debtor would have to surmount were it ultimately to prevail in this matter. It is unnecessary, of course, to undertake such analysis given the nature of the disposition of this matter.

### 2. Application of New York Limitations Law.

Since the Debtor has not asserted that Emmerich's claim was untimely under New York law, it is deemed (in this Court, at least) to have accepted the fact that the Civil Action was commenced in the federal district court in New York prior to the expiration of the New York limitations period for fraud actions. Hence, the enforceability of Emmerich's claim is not impaired by an applicable statute of limitation or repose.

### V. CONCLUSION

For the foregoing reasons, an Order shall enter **OVERRULING** the Debtor's objection to Proof of Claim No. 7.

---

5. Nor are the cited cases fully representative of the range of bankruptcy court authority. In fact there is a divergence of opinion on these issues at the bankruptcy court level. Several cases have faithfully followed the *Vanston* approach. *See, e.g., In re SMEC, Inc.,* 160 B.R. 86, 89–91 (M.D.Tenn.1993); *Matter of Ovetsky,* 100 B.R. 115, 117–18 (Bankr.N.D.Ga.1989); *In re Kaiser Steel Corp.,* 87 B.R. 154, 157–60 (Bankr.D.Colo.1988).