**In re Steven SEGRETARIO, Debtor.**

**Andre Emmerich Gallery, Inc., Plaintiff,**

**v.**

**Steven Segretario, Defendant.**

**Bankruptcy No. 96–30082.**
**Adversary No. 96–3056.**

United States Bankruptcy Court, D. Connecticut.

March 2, 2001.

John W. Colleran, Colleran & Carboni, P.C., New Haven, CT, for Plaintiff.

James G. Verrillo, Zeisler & Zeisler, P.C., Bridgeport, CT, for Debtor–Defendant.

## MEMORANDUM OF DECISION ON MOTION TO DISMISS ADVERSARY PROCEEDING

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This Memorandum of Decision sets forth the rationale for the Court's determination with respect to the referenced contested matter. The instant motion to dismiss the pending dischargeability Complaint requires the Court to determine whether a Connecticut statute of limitation cuts off the bankruptcy rights of a creditor. For the reasons stated more fully herein, an order shall enter this day denying the Defendant's motion.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b), and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. § 157(a), (b)(1). This contested matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I).

### III. FACTUAL AND PROCEDURAL BACKGROUND

The present dispute has its origin in a contest over the authenticity of a monumental work of sculpture, "Two White Dots" (hereafter, the "Work"), attributed to the renowned Modern artist, Alexander Calder (hereafter, "Calder"). The Andre Emmerich Gallery, Inc. (hereafter, "Emmerich" or "Plaintiff") claims that it has been injured by false and fraudulent representations concerning the Work made in writing by the present Debtor–Defendant,

Steven Segretario a/k/a Steven Segre (hereafter, "Segretario" or "Defendant"). It is undisputed that Segretario constructed the Work, and then sold it in 1983— seven years after Calder's death. The allegedly false and fraudulent representations were contained in an agreement dated November 18, 1983 (hereafter, the "Agreement"), which attended Segretario's sale of the Work to an art dealer residing in North Woodmere, New York. In the Agreement, Segretario represented and warranted the following facts (hereafter, collectively referred to as the "Attribution"), *inter alia,* concerning the Work:

    (i) the Work was "conceived and designed" by Calder;

    (ii) the Work was "duly commissioned" by Calder to be fabricated by Segretario;

    (iii) Segretario fabricated the Work under the "supervision and direction" of Calder; and

    (iv) Calder saw the Work as it was being fabricated, but never "signed" the Work prior to his death.

The Work was subsequently sold and resold several times—including an auction sale at Sotheby's—on the strength, at least in part, of the Attribution. The ultimate vendor in this chain was Emmerich, which purchased the Work in 1990 and then sold the same in 1992 to Jon Shirley for approximately $900,000.00. When Mr. Shirley submitted the Work for inclusion in the Calder *catalogue raisonne*—*i.e.* the authoritative listing of Calder works prepared under the auspices of the Calder Foundation—the Work was rejected on the ground that Segretario had admitted to the Calder Foundation that the Work had been constructed in 1982, *i.e.* not during the lifetime of Calder. As a result of this information, Emmerich accepted return of the Work from Mr. Shirley and refunded his purchase price.

In 1995, Emmerich commenced a civil action against Segretario, *et alius,* in the United States District Court for the Southern District of New York (hereafter, the "Civil Action"), pleading a cause of action sounding in common law fraud, and praying for a monetary judgment in excess of $1,000,000.00 (hereafter, the "Claim"). The Civil Action was stayed by the commencement of the instant bankruptcy case in this Court on January 11, 1996 (hereafter, the "Petition Date").

The Plaintiff initiated the instant adversary proceeding (Adv.Pro. No. 96–3056) (hereafter, the "Adversary Proceeding") within the pending bankruptcy case, seeking a determination of non-dischargeability as to its Claim pursuant to Bankruptcy Code Section 523(a)(6). Within the Adversary Proceeding the Defendant has initiated the present contested matter through the filing of a Motion to Dismiss (Doc. I.D. No. 14) (hereafter, the "Motion to Dismiss") pursuant to Fed.R.Civ.P. 12(b), made applicable to the instant adversary proceeding by Fed. R. Bank. P. 7012(b).

## IV. DISCUSSION

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) essentially tests the legal sufficiency of a plaintiff's complaint. Under that Rule, a court must accept the allegations of the challenged complaint as true. *E.g., Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). A court should dismiss under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45– 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Cohen v. Koenig,* 25 F.3d 1168, 1171 (2d Cir.1994).

### A. Elements of Non–Dischargeability.

In the instant adversary proceeding, the Plaintiff seeks to determine the dischargeability of an alleged debt from the Defendant under the standards of Bankruptcy Code Section 523(a)(6), which provides in pertinent part as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any *debt*—

\*    \*    \*    \*    \*    \*

■ (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a) (1996) (emphasis supplied). Plainly then, unless the Plaintiff is the holder of a "debt",[1] *inter alia,* it may not successfully prosecute a non-dischargeability action under Section 523(a)(6).

## B. Ascertainment of a "Debt".

The term "debt" is defined by the Bankruptcy Code as *"liability* on a claim". 11 U.S.C. § 101(12) (1996) (emphasis supplied). The term "claim", in turn, means a "right to payment, whether or not such right is *reduced to judgment, liquidated,* . . . [or] disputed. . . .", 11 U.S.C. § 101(5)(A) (1996).

The sole basis of the Motion to Dismiss is the Defendant's assertion that the Plaintiff's Complaint fails to state a claim upon which relief can be granted because his liability on the Claim is governed by, and was cut off by Section 52–577 of the Connecticut General Statutes[2]—Connecticut's statute of "limitation"[3] with respect to tort actions. In essence, the Defendant is arguing that there is no "debt" owing to the Plaintiff as required under Section 523(a) because there is no present "liability" on the Claim.

By contrast, the Plaintiff contends that it is indeed owed a viable "debt" because its rights against the Defendant are governed by New York law, under which its assertion of the Claim through the Civil Action was timely under NYCPLR §§ 213(8), 203(g)—New York's statute(s) of limitation for fraud.

In light of the foregoing, the fundamental question before the Court is whether C.G.S. § 52–577 is applicable to the Claim. Resolution of that question requires this Court to make a choice of the limitations law—Connecticut or New York—which is to govern the Claim.

## 1. Choice of Law.

### a. *Federal common law.*

■ A debtor's liability on a pre-petition claim must be determined on the strength of the claim's factual and legal underpinnings as they existed immediately prior to the order for relief in bankruptcy. Truly, "[p]arties are in bankruptcy court with their rights and duties already established. . . ." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 169, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (Bankruptcy Act case; concurring opinion of Justice Frankfurter). Further, such liability is determined by reference to the applicable *non-bankruptcy* law under which such rights and duties were created. *Cf. Raleigh v. Illinois Dep't. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation. . . .").

■ In ascertaining the law under which a claim was created, a bankruptcy court—sitting by virtue of the jurisdictional grant of 28 U.S.C. § 1334—does not mechanically apply the outcome-determinative law of the state where it sits, as it might were it a district court sitting by virtue of diversity jurisdiction. *Vanston,* 329 U.S. at 162, 67 S.Ct. 237. Rather, the bankruptcy court should employ its power to apply and create federal common law by exercising an *independent judgment* as to choice of law. *Id., see, e.g., In re SMEC,*

---

1. This is the only element of Section 523(a)(6) placed in issue by the Motion to Dismiss.

2. At all times relevant to these matters C.G.S. § 52–577 provided that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

3. Technically, C.G.S. § 52–577 is a statute of "repose".

*Inc.*, 160 B.R. 86, 89–91 (M.D.Tenn.1993). In general, a bankruptcy court's choice of applicable law "requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states." *Vanston*, 329 U.S. at 162, 67 S.Ct. 237.

■ The Second Circuit Court of Appeals has recently instructed that the general federal common law choice-of-law rule directs a court to apply the law of the jurisdiction having the greatest *interest* in the litigation. *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (2d Cir. 1992). A court's goal under this paradigm is to evaluate each jurisdiction's contacts with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent. *Id.*

■ In the pending Adversary Proceeding the Defendant is a Connecticut resident. However, the Plaintiff is a New York entity, and there is no evidence before the Court suggesting that the relevant acts giving rise to the Claim occurred in any State other than New York. Specifically, the Agreement, and therefore the Attribution, was made in North Woodmere, New York; all subsequent sales of the Work appear also to have occurred in New York between New York entities. Finally, the Court takes judicial notice of the incontestable fact that New York City hosts a premier, if not the preeminent, fine arts market in the United States. New York State's overriding interest in protecting and policing the integrity of that market under its own laws is self-evident. Connecticut's interest in protecting its residents from the application of New York's fraud laws is slight by comparison. Accordingly, this Court will look to New York's limitations law in assessing whether the Complaint pleads a valid "debt", *i.e.* a subsisting "liability" on the Claim.

### b. Equitable principles.

■ The advisability of the Court's selection of New York limitations law is reinforced by a consideration of equitable and other jurisprudential principles endorsed by the United States Supreme Court. *See Raleigh, supra,* 120 S.Ct. at 1957–58; *Vanston,* 329 U.S. at 163, 67 S.Ct. 237 ("bankruptcy courts must administer and enforce the [bankruptcy laws]... under equitable principles"). The unique jurisdictional and statutory context of bankruptcy requires that this Court undergird and overlay its analysis with general equitable principles such as "uniformity, ... fairness and equity." *Vanston,* 329 U.S. at 167, fn. 10, 67 S.Ct. 237. It is fundamentally unfair, and subversive of uniformity, for a debtor in the Defendant's position to be permitted to defeat a creditor's claim—which was timely prosecuted in, and under the law of, the state with the greatest interest in the dispute—through the simple maneuver of filing a bankruptcy case in a different state where a less generous statute of limitation arguably controls. Determinations of the dischargeability of debts should not depend upon the happenstance or devise of bankruptcy venue. To rule otherwise would encourage forum-shopping by debtors who may contemplate moving a residence, or restructuring business operations to permit a bankruptcy filing in a state with an expired limitations period on material claims against them. Accordingly, this Court can, and would, act to preclude the result urged by the Defendant here.

In adopting this approach, this Court draws support from *Raleigh*'s endorsement of similar notions of equality and uniformity in a closely analogous context. There, the Supreme Court was considering whether the allocation of the burden of proof applicable under state law to a state tax claim could be altered in claim allowance litigation in the Bankruptcy Court. The Court observed that the fact that the automatic stay of Bankruptcy Code Section 362 could be lifted to permit a claim to

be liquidated through litigation in a non-bankruptcy forum presented the potential for unequal treatment of a creditor inside and outside a pending bankruptcy case.[4] *Raleigh,* 120 S.Ct. at 1957–58. If the Defendant's arguments concerning the effect of Connecticut law were correct, the same potential for inequality would be present here.[5]

### c. The impact of Koreag.

Despite this Court's conclusion that the federal common law supplies the choice-of-law rule governing this matter, the Court would be remiss not to address the Defendant's contention that *Koreag* provides an alternative and authoritative methodology, compelling this Court to select and apply Connecticut choice-of-law rules and limitations law. In *Koreag* a Second Circuit panel outlined what the Court interprets as a four-step analytical process to resolve an issue of law arising in the context of a bankruptcy case. *See Koreag,* 961 F.2d at 350–51. Under that outline, a court would (1) *characterize* the subject issue as either "predominately founded upon state-created rights [hereafter, a 'State Issue'], or involving important concerns implicating national bankruptcy policy" (hereafter, a "Bankruptcy Policy Issue"); (2) *select* the appropriate choice-of-law rule (in the instance of a State Issue the court would access the choice-of-law rule of the *forum* state, and in the instance of a Bankruptcy Policy Issue it would reference the *federal common law* choice-of-law rule); (3) *utilize* the selected choice-of-law rule to determine which of the possible jurisdictions should supply the substantive rule of deci-

sion on the subject issue; and (4) *apply* the selected local substantive law to the facts of the case. *See id.* The novelty of *Koreag* lies in steps (1) and (2), which would compel a court to choose a choice-of-law rules based upon issue characterization.

This Court declines to regard *Koreag* as binding authority in the instant matter for several reasons. First, *Koreag*'s analytical outline is *dicta*—in that case the Panel did not fully employ a four-step approach. Rather, it bypassed the first and second steps—*characterization* and *selection*—and proceeded directly to the third step—*utilization*—having concluded that the former were unnecessary since each of the possible choice-of-law rules pointed to the decisional law of the same jurisdiction.

Second, the language employed by the Panel in *Koreag* equivocates on whether a court *must* engage in the initial *characterization* step. The Panel muses, "[s]electing the appropriate conflicts rules would thus *seem* to require us to characterize the present issue ... as either predominately founded upon state-created rights, or involving important concerns implicating national bankruptcy policy." *Id.* at 350 (emphasis supplied). Such equivocation is understandable given the fact that (i) the Panel cites only non-binding Bankruptcy Court authority for the proposition that a court should look to the forum state's choice-of-law rules where "the underlying rights and obligations of the subject dispute are defined by state law....", *id.;*[6] and (ii) it was unnecessary for the

---

**4.** A court's abstention under 28 U.S.C. § 1334(c) would provide the basis for a similar hypothetical to the same effect.

**5.** While it is common in bankruptcy parlance to refer to the bankruptcy courts' jurisdiction over 523(a)(6) claims as "exclusive", that is not technically correct. Certainly, such dischargeability claims must be commenced in *some* forum within the time limits of Fed. R. Bank. P. 4007, but there is no legal prohibition of a state court making determinations of dischargeability. Such scenario might be

precipitated through a bankruptcy court's relief from stay and/or abstention order.

**6.** Nor are the *cited cases* fully representative of the range of Bankruptcy Court authority. In fact there is a divergence of opinion on these issues at the Bankruptcy Court level. Several cases have faithfully followed the *Vanston* approach. *See, e.g., In re SMEC, Inc.,* 160 B.R. 86, 89–91 (M.D.Tenn.1993); *Matter of Ovetsky,* 100 B.R. 115, 117–18 (Bankr.N.D.Ga.1989); *In re Kaiser Steel Corp.,* 87 B.R. 154, 157–60 (Bankr.D.Colo.1988).

Panel to characterize the underlying nature of the rights at issue since the choice-of-law rules in the competing jurisdictions were indistinguishable as applied to the dispute in that case.

More fundamentally though, this Court views *Vanston* as *the* controlling authority on the choice-of-law issues involved in the instant matter. Granted, *Vanston* and *Koreag* are both *dicta* on the question at bar. But, to the extent that *Koreag* intended to suggest a bankruptcy choice-of-law paradigm at odds with *Vanston,* this Court must follow the lead of the United States Supreme Court.

This Court also feels compelled to comment that even if it deemed the *Koreag* paradigm as binding over that gleaned from *Vanston,* it would still decline to follow *Koreag* here. Rather, the Court would act under the guidance of the overriding equitable principles discussed *supra,* at Section IV.B.1.b. of this Memorandum of Decision, to preclude the Defendant from defeating the Plaintiff's bankruptcy rights through the happenstance or devise of the venue of the underlying bankruptcy case. Finally, it is far from clear that following *Koreag*'s four-step outline would even lead to dismissal of the Complaint. The Court has plotted that analytical path and identified several close legal issues—some raised by the parties, and some not—which the Defendant would have to surmount were he ultimately to prevail in this matter. It is unnecessary, of course, to undertake such analysis given the nature of the disposition of this matter.

### 2. Application of New York Limitations Law.

Since the Defendant has not asserted that the Claim was untimely under New York law, it is deemed (in this Court, at least) to have accepted the fact that the Civil Action was commenced in the federal district court in New York prior to the expiration of the New York limitations period for fraud actions. Hence, the "debt" alleged in the Complaint is not impaired by an applicable statute of limitation or repose.

## V.  CONCLUSION

For the foregoing reasons, an Order shall enter **DENYING** the Debtor's Motion to Dismiss.